## SAULSBURY OIL CO. v. PHILLIPS PETROLEUM CO. et al.

## PHILLIPS PETROLEUM CO. et al. v. SAULSBURY OIL CO.

### Nos. 2770, 2771.

Circuit Court of Appeals, Tenth Circuit.

March 21, 1944.

Rehearing Denied May 1, 1944.

30

F. H. McGregor, of Amarillo, Tex., for Saulsbury Oil Co.

Warren M. Sparks, of Amarillo, Tex., and Rayburn L. Foster, of Bartlesville, Okl. (Don Emery, of Bartlesville, Okl., and E. H. Foster, of Amarillo, Tex., on the brief), for Phillips Petroleum Co.

D. H. Culton, of Amarillo, Tex., amicus curiae.

Before PHILLIPS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

On September 5, 1933, Saulsbury Oil Company[1] was the owner of oil and gas leases on five tracts of land situated in Gray County, Texas. On that date, Saulsbury entered into a contract with Phillips Petroleum Company,[2] whereby Saulsbury agreed to drill six wells on the tracts covered by such leases and Phillips agreed to furnish the drilling rigs and equipment with which to drill and complete such wells and to advance to Saulsbury $2,500 upon the completion of each well. Out of three-fourths of the seven-eighths working interest, Saulsbury agreed to pay Phillips for the equipment used in drilling and completing the wells and not returned and to repay the money advanced by Phillips. It also agreed to assign to Phillips one-half of the working interest upon the completion of each well. By a supplemental agreement entered into by Saulsbury and Phillips on September 18, 1933, Saulsbury gave Phillips an option to purchase the interests of Saulsbury in the casinghead gas produced from such leases and agreed to execute Phillips' usual form of casinghead gas contract therefor. By a supplemental agreement entered into March 31, 1934, the number of wells to be drilled was reduced to five. Pursuant to such contracts, three wells were drilled, referred to in the record as the Cubine wells, which were productive of sweet gas as defined in Art.

6008, Sec. 2(h), Vernon's Ann.Tex.Civil Stat.[3] On October 18, 1933, Saulsbury and Phillips entered into a casinghead gas contract by which Saulsbury agreed to sell to Phillips the natural gas produced from the three Cubine wells.

On March 15, 1940, Saulsbury brought an action against Phillips and the Independent Natural Gas Company[4] in the District Court of Oklahoma County, Oklahoma, to recover damages for alleged breach of such casinghead gas contract. The case was duly removed to the Federal court.

On September 30, 1935, Saulsbury was the owner of three oil and gas leases on three tracts of land situated in Gray County, Texas. On that date, it entered into three separate contracts with Phillips whereby Saulsbury agreed to drill one well on each of such tracts. Under two of the contracts, Phillips agreed to advance Saulsbury $6,600 and, under the third, $5,800 when the respective wells were commenced to enable Saulsbury to pay for such leases. Phillips also agreed to advance Saulsbury $7,000 upon the completion of each of the three wells. Under each contract, Phillips was to be repaid the sums advanced out of one-half of the seven-eighths working interest. The three wells were completed and are referred to in the record as the Haden wells. On September 30, 1935, Saulsbury entered into three casinghead gas contracts with Phillips for the sale of gas produced from such wells. These contracts were identical except that each contract described a different tract of land. On June 26, 1940, Saulsbury commenced an action against Phillips and Independent in the District Court of Oklahoma County, Oklahoma, for alleged breach of the last three mentioned casinghead gas contracts. The suit was duly removed to the Federal court.

In the three casinghead gas contracts of September 30, 1935, Saulsbury is referred to as "seller" and Phillips as "buyer." They describe the tracts of land covered by the leases. They recite that the seller is the owner of the leases; that it is operating wells thereon that are or may be productive of casinghead gas; that the seller desires "to sell the casinghead gas" which may be produced from such wells. They define casinghead gas as follows:

---

[1] Hereinafter called Saulsbury.
[2] Hereinafter called Phillips.
[3] See Note 6, infra.
[4] Hereinafter called Independent.

"* * * The term 'casinghead gas' is defined herein as it is defined in existing law; and also includes any other natural gas from which natural gasoline can be extracted, provided the residue gas therefrom is utilized as required by law, * * *"

They further recite that the buyer has in operation a gasoline plant in the vicinity of such wells and "desires to buy said casinghead gas." They provide that in consideration of $1.00 and other specified payments and covenants, "* * * the Seller hereby grants, bargains, sells and agrees to deliver and take from the Seller, subject to the stipulations and conditions hereinafter specified, all the casinghead gas now or hereafter produced from * * *" such wells.

They provide that the gas sold "is conveyed to the Buyer for the purpose of manufacturing therefrom gasoline or such other product or products as may be manufactured at Buyer's plant"; that the buyer shall "take all the gas testing more than ¾ gallons of gasoline per thousand cubic feet of gas"; that the buyer shall return to the seller sufficient residue gas for the development and operation of the respective leases, not to exceed the amount of gas remaining from the casinghead gas delivered to the buyer after the extraction of the gasoline therefrom, less "the proportionate part" of such residue gas necessary for gasoline plant operation, both determined by the residue gas curve attached to the contracts; and that if and when there is residue gas in excess of buyer's needs for plant operation and seller's needs for lease development and operation "the Buyer shall have the right without the obligation to sell any or all surplus residue gas so remaining" and that the buyer shall pay the seller fifty per cent of the net proceeds received from the sale of such gas. They define net proceeds as gross proceeds less "any cost of boosting and/or transportation necessary to market such gas."

They provide:

"* * * The volume of surplus residue gas sold from the casinghead gas delivered hereunder shall be determined by the proportion which the volume of surplus residue gas available for sale from said delivery bears to the total volume of surplus residue gas available for sale from all casinghead gas delivered to said plant. * * *"

"8. —Settlement Tests — The gasoline content shall be determined by a field compression test or charcoal test, at Seller's option made in accordance with the official code of the Natural Gasoline Association of America for testing natural gas for gasoline content. * * *"

They provide that the buyer shall pay the seller for the casinghead gas delivered under the contract a price per M. C. F.[5] computed on a basis set forth in the contracts.

They provide that the seller warrants its title to the casinghead gas, and that it has good right to sell such gas to the buyer; that the buyer shall not be required to pay therefor until the seller shall have furnished buyer abstracts of title covering such leases showing good and merchantable title in the seller; and that the seller shall account and pay to the lessors or royalty owners, in strict accordance with the leases, royalty on the casinghead gas "sold and delivered * * * to the Buyer."

The casinghead gas contract of October 18, 1933, differed only from those of September 30, 1935, in the following particulars:

It describes different leases; its provision with respect to the sale of residue gas by the buyer does not contain the phrase "without the obligation"; its provision respecting settlement tests omits the provision: "or charcoal test, at Seller's option"; and it defines casinghead gas as follows:

"it being understood that the term casinghead gas means all natural gas produced from the above described premises including the gas issuing from oil wells whether produced from the same sand or strata from which the oil is produced or by the induction of gas with compressors or other means for flowing the oil."

In other respects it is substantially identical with the contracts of September 30, 1935.

While the casinghead gas contracts covered all types of natural gas, sweet, sour, and casinghead,[6] the Cubine and Haden wells produced only sweet gas.

---

[5] M. C. F. is used as an abbreviation for "thousand cubic feet."

[6] Sour gas is defined by Art 6008, § 2 (g) of Vernon's Ann.Tex.Civil Stat., as natural gas containing more than 1½ grains of hydrogen sulphide per 100 cubic feet or more than 30 grains of total sulphur per 100 cubic feet or gas which in

The Cubine and Haden wells are situated in the Panhandle Gas Field, which runs from Southern Wheeler County in a north-westerly direction through Wheeler, Gray, Carson, Potter, Hutchinson, Moore, and Hartley Counties, Texas. It is approximately 124 miles in length and of an average width of 20 miles. It contains 1,504,-386 acres, of which 1,066,662 acres produce sweet gas, and 437,724 acres produce sour gas. A detailed description of the field is set forth in a special order of the Railroad Commission of Texas [7] of December 10, 1935, quoted in part in the footnotes of the opinion in Consolidated Gas Utilities Corporation v. Thompson, D.C., 14 F.Supp. 318.

At the time the casinghead gas contracts were entered into, Phillips was engaged in the manufacture of natural gasoline from gas at its five gasoline extraction plants located in Gray County, Texas, known as the Gray, Pampa, Bowers, North, and Lefors plants, and collectively as the Pampa System. It acquires the raw material by purchase from producers from hundreds of wells and also in substantial quantities from wells on its own leases. The gas is gathered from areas in Gray and Wheeler Counties, Texas, through 250 to 300 miles of gathering lines, delivered to connecting trunk pipe lines, and carried by them to the gasoline plants for gasoline extraction. Sweet and casinghead gas are commingled in the gathering system and processed in the plants as a single commingled gas. All of the plants, except North, are interconnected on the intake or raw gas side. All of the plants, except Lefors, are interconnected by pipe lines on the discharge or residue side of the plants. After the gasoline has been extracted from the gas, the residue gas is distributed through 150 to 200 miles of residue pipe line.

The gas produced and sold by Saulsbury to Phillips from the Cubine and Haden wells was commingled in the pipe lines of Phillips with other sweet and casinghead gas and processed in the Pampa, Gray, and Lefors plants. A part of the residue gas from the commingled gas processed in such plants was compressed or boosted in what is known as the Grayco Booster and transported and sold to Northern Natural Gas Company.[8] Independent, a wholly-owned subsidiary of Phillips, owns and operates this boosting and transportation system, which is known as the Grayco Booster System.

On May 26, 1930, Phillips Natural Gas Company,[9] a wholly-owned subsidiary of Phillips, and a predecessor of Independent, entered into an agreement with Missouri Valley Pipe Line Company,[10] predecessor of Northern, whereby Phillips Natural agreed to sell and deliver residue gas, which it had contracted to purchase from Phillips, to Missouri Valley for $5\frac{1}{2}$ cents per M. C. F. for the first two years, and 6 cents per M. C. F. for the next eight years, and thereafter at the highest prevailing market price in the vicinity, but not less than 6 cents per M. C. F. Phillips Natural agreed to transport the gas to the main pipe line of Missouri Valley near Skellytown, Texas, and to deliver it at a pressure sufficient to enter said pipe line, but not to exceed 425 pounds per square inch. To make such deliveries, Phillips Natural obligated itself to construct the Grayco Booster with a capacity of 50,000 M. C. F. of gas per day, and to lay a 24-inch pipe line to the point of delivery. Phillips Natural constructed the booster plant and the pipe line system at a total cost of approximately $1,800,000. In May, 1930, Phillips entered into a contract with Phillips Natural to sell it the gas to supply Missouri Valley at a price of 2 cents per M. C. F. This price was later reduced to 1 cent per M. C. F. by an agreement between Phillips and Phillips Natural dated April 28, 1931. In August, 1935, the price was changed to a sliding scale, ranging from 1 to 2 cents per M. C. F., depending upon the average daily volume transported and sold during the month.

For the residue gas ultimately purchased and received by Missouri Valley and Northern, Phillips accounted to Saulsbury and paid the latter on the basis of the price which it received therefor from its subsidiaries, Phillips Natural and Independent.

On May 1, 1933, a contract, known as

---

its natural state is found by the Railroad Commission to be unfit for use in generating light or fuel for domestic purposes. Casinghead gas is defined as any gas or vapor indigenous to an oil stratum and produced from such stratum with oil. Sec. 2(i). Sweet gas is defined by § 2 (h) of the statute as all natural gas except "sour gas" and "casinghead gas."

[7] Hereinafter referred to as the Commission.

[8] Hereinafter called Northern.

[9] Hereinafter called Phillips Natural.

[10] Hereinafter called Missouri Valley.

the Youngstown Agreement, was entered into between Phillips Natural, as vendor, Northern Gas & Pipe Line Company,[11] as purchaser, and the Youngstown Sheet & Tube Company.[12] By the terms of this agreement, Phillips Natural agreed to accept payment for gas on the basis of 3 cents per M. C. F. in cash and 3 cents per M. C. F. in preferred stock of Northern until January, 1934. The Pipe Line Company agreed to purchase and take not less than 15,000 M. C. F. and not more than 50,000 M. C. F. of gas per day, commencing September 1, 1933, during the term of the Youngstown Agreement. Youngstown agreed to sell and deliver to Pipe Line Company approximately 8,000 tons of pipe at a cost of approximately $500,000 and to accept payment therefor in preferred stock of Northern. Phillips Natural agreed that commencing January, 1934, it would take monthly from Youngstown at par and accrued dividends, the preferred stock of Northern acquired by Youngstown of a par value equal to 3 cents per M. C. F. of gas purchased by Pipe Line Company from Phillips Natural during the preceding month. By a supplemental agreement dated June 21, 1933, Phillips Natural gave Pipe Line Company an option to repurchase the stock acquired by Phillips Natural within one year from the date of acquisition by Phillips Natural at certain specified discounts. The supplemental agreement of June 21, 1933, further obligated Pipe Line Company, in addition to the minimum specified in the contract of May 1, 1933, from and after September 1, 1937, or at such earlier time as Phillips Natural should have acquired Northern preferred stock of the par value of $1,000,000, to purchase a minimum of not less than 10,000,000 M. C. F. per year. At the time of the execution of the contracts of May and June, 1933, 33,000 M. C. F. of residue gas per day were being vented to the air for lack of market. The pipe which Pipe Line Company received from Youngstown was used to extend Pipe Line Company's lines to the St. Paul and Minneapolis, Minnesota, area, thereby enlarging its market facilities. As a result of these contracts, Pipe Line Company's purchase of residue gas from Phillips Natural more than doubled.[13] Within the time prescribed in the contract of June, 1933, Northern redeemed the stock and paid Phillips Natural therefor $732,108.08, being the par value of the stock, less the specified discounts.

The two cases were consolidated below. The trial court found that Phillips had breached the contracts in certain particulars and awarded Saulsbury judgment for $26,271.53, with interest at six per cent from December 28, 1942. From that judgment Saulsbury appealed and Phillips cross-appealed.

## 1. *Title to the Casinghead Gas.*

The casinghead gas contracts, in terms, are contracts of sale. The parties are referred to as seller and buyer. They provide that the seller grants, bargains, sells, and agrees to deliver the casinghead gas to the buyer and that the buyer agrees to purchase and take such gas from the seller. The seller warrants that he has good title to such gas and good right to sell such gas. They refer to the casinghead gas sold and delivered to the buyer. Every element essential of a sale is present and there is nothing to indicate that the parties intended otherwise. A contract not substantially different from the casinghead gas contracts in the instant case was held to be a contract of sale in Martin v. Amis, Tex.Com.App., 288 S.W. 431.

It is true that Phillips was obligated to return to Saulsbury a portion of the residue gas remaining after the processing of the casinghead gas. The residue gas to be returned was not a portion of the casinghead gas sold. It was a residue remaining after a processing operation which removed the natural gasoline and was a by-product of the casinghead gas. The casinghead gas contracts did not reserve a part of the casinghead gas in its original form as a royalty to Saulsbury. If the

---

[11] Hereinafter called Pipe Line Company.

[12] Hereinafter called Youngstown.

[13] During the 12 months preceding September 1, 1933, the effective date of such contracts, Pipe Line Company purchased 4,695,994,000 cubic feet of gas from Phillips Natural. During the succeeding 12 months, it purchased 9,448,914,999 cubic feet of gas from Phillips Natural. During the period of 7-1/3 years from September 1, 1933, to December 31, 1940, Pipe Line Company and its successor, Northern, purchased 77,444,267,000 cubic feet of gas from Phillips Natural and Independent, or in excess of 10 billion cubic feet per year.

identical thing delivered is to be returned there is ordinarily no transfer of title, but if the person to whom delivery is made is to return another thing of the same kind or a different thing, the transaction will ordinarily constitute a sale and effect a change of title.[14]

We conclude that the title to the casinghead gas passed to Phillips on the delivery thereof into its gathering lines.

■ Moreover, at the trial below counsel for Saulsbury stated that it was taking the position that title to the casinghead gas passed to Phillips upon its delivery at the mouth of the wells. The cases were tried on that theory below. Saulsbury may not on appeal change its theory and take a position inconsistent therewith.[15]

### 2. Marketing of Residue Gas.

Under the Cubine casinghead gas contract, Phillips was authorized to sell the residue gas remaining after the gas for operating Phillips' plants and developing and operating the leases had been provided. Under the Haden casinghead gas contracts, Phillips was authorized but not obligated to sell such residue gas. Under all of the contracts, Phillips was required to pay Saulsbury fifty per cent of the proceeds derived from the sale of residue gas, less boosting and transporting costs necessary to market such gas.

■ Under the Cubine casinghead gas contract, there was an implied obligation on the part of Phillips to exercise reasonable diligence to market the residue gas available for sale.[16]

■ We doubt there was an implied obligation so to do under the Haden casinghead gas contracts, but we deem it unnecessary to determine that question because Saulsbury neither pleaded nor proved that Phillips at any time failed to exercise reasonable diligence to market the commingled residue gas available for sale. The undisputed evidence is to the contrary. Phillips, through its wholly-owned subsidiaries, constructed a boosting and transportation system at a cost of $1,800,000 and agreed to accept preferred stock from Northern in order to bring about an extension of the lines of Pipe Line Company and thereby enlarge the market for the gas.

■ Saulsbury's contention that if there was an available market for its proportion of the residue gas in the commingled mass, Phillips was bound to sell Saulsbury's proportion, to the exclusion of the remainder of the commingled gas, is clearly untenable. At the time the casinghead gas contracts were entered into, the plants and gathering lines of Phillips were in operation and the gas purchased by Phillips from the several sellers in the field was being commingled. It is not practical to handle gas in any other manner. Moreover, the provisions of the casinghead gas contracts, as to the manner in which the volume of casinghead gas should be determined, show clearly that the parties contemplated that the gas would be commingled. Under like contracts with other sellers, Phillips was under the same implied obligation to sell the residue gas acquired from them. So long as Phillips sold all the residue gas for which it could find a market and accounted to Saulsbury for its proportion of the gas sold, in accordance with the provisions of the casinghead gas contracts, it met the express and implied obligations of such contracts.

### 3. Failure to Take the Full Allowable Production of the Cubine and Haden Wells.

Sec. 15, Art. 6008, Vernon's Ann.Tex. Civil Stat., prohibits the production of sweet gas from wells in common reservoirs producing both sweet and sour gas, such as the Panhandle Field, in excess of 25 per cent of the daily productive capacity of the wells.

Phillips took a greater proportion of the allowable of the Cubine and Haden wells than it took of the average allowable of the other wells in the field.[17]

---

[14] Alamitos Land Co. v. Texas Co., 11 Cal.App.2d 614, 54 P.2d 489; Scott Mining & Smelting Co. v. Shultz & Clary, 67 Kan. 605, 73 P. 903, 904; Norton v. Woodruff, 2 N.Y. 153.

[15] Baldi v. Ambrogi, 67 App.D.C. 101, 89 F.2d 845, 846; Wickwire v. Martin, 10 Cir., 63 F.2d 64, 65; United States v. Peterson, 10 Cir., 34 F.2d 245, 249, 250; Sacramento Suburban Fruit Lands Co. v. Melin, 9 Cir., 36 F.2d 907, 909; Rees v. Lombard, 9 Cir., 21 F.2d 276, 277.

[16] Wolfe v. Texas Co., 10 Cir., 83 F.2d 425, 432; Cole Petroleum Co. v. United States G. & O. Co., 121 Tex. 59, 41 S.W. 2d 414, 416, 86 A.L.R. 719; Strange v. Hicks, 78 Okl. 1, 188 P. 347, 350.

[17] Phillips took an average of 6.8 per cent of the daily potential from the Cu-

It is true that the casinghead gas contracts provided for the sale of all of the casinghead gas produced from the wells and that the term "casinghead gas" as used in such contracts embraced not only casinghead gas in its ordinary acceptation, but also all natural gas from which natural gasoline can be extracted. But the obligation of Phillips to take was expressly limited by such contracts to gas testing more than ¾ gallon of gasoline per M. C. F. of gas and the gas from the Cubine and Haden wells never tested as much as ¾ gallon of gasoline per M. C. F. of gas. Hence, Phillips was not required to take all of the allowable. Counsel for Saulsbury asserts that such provision is limited to casinghead gas in its ordinary acceptation and does not apply to dry, sweet, natural gas. The casinghead gas contracts cover all natural gas and it is not reasonable to assume that the parties intended that Phillips should not be obligated to take lean casinghead gas but should be obligated to take lean, natural, dry gas. Saulsbury, at all times, knew that Phillips was taking less than 25 per cent of the daily open flow potential of the wells and made no objection thereto. For a period of more than six years as to the casinghead gas contract respecting the Cubine wells and almost five years as to the casinghead gas contracts respecting the Haden wells, Saulsbury and Phillips treated such contracts as not obligating Phillips to take the full allowable from such wells. Moreover, the provision limiting the obligation of Phillips to take gas found in the casinghead gas contract respecting the Cubine wells was incorporated in the casinghead gas contracts respecting the Haden wells. Saulsbury executed the latter contracts two years after it had executed the former contract, well knowing that Phillips had not been taking the full potential from the Cubine wells under the earlier contract.

■ Where the parties to a contract have given it a practical construction by their conduct, such construction is entitled to great weight in determining its proper interpretation.[18]

■ We hold the contracts gave Phillips an option to take but did not obligate it to take the gas from the Cubine and Haden wells, and that such option was supported by a consideration. Moreover, if the provisions of the casinghead gas contracts to the extent that they were executory were illusory, to the extent that they were executed they were binding on the parties.[19]

### 4. Butanes and Propanes.

The gas delivered from the Cubine and Haden wells tested .261 of a gallon per M. C. F. Attached to the casinghead gas contracts was a residue gas curve adopted by the Natural Gas Association of America and a standard natural gas table of the Natural Gas Association of America. The residue gas curve really consists of three curves, (1) the percentage of volume remaining after extraction of gasoline only, (2) the percentage of volume used for plant fuel, and (3) the percentage of volume remaining after extraction and use of gas for plant fuel. Under such contracts and the standard table and curves incorporated therein, where the gas tested 25/100 per cent per gallon, Phillips was permitted to reduce the volume of raw gas delivered by extraction of gasoline and use of gas for plant fuel, not to exceed 8.95 per cent. In other words, under such contracts, the volume of residue gas remaining after extraction and use of gas for plant fuel could not be less than 91.05 per cent of the total volume of raw gas delivered.

■ The record reflects that at no time did Phillips extract gasoline in excess of the permitted percentage of loss from extraction of gasoline as reflected by the first curve and the standard table, except during the year 1940 when the amount ex-

bine wells and an average of 6.6 per cent of the daily potential of all other wells to which it was connected in the east sweet field. Phillips took an average of 11.1 per cent of the daily potential from the Haden wells and an average of 9.4 per cent of the daily potential from all other wells to which it was connected in the west sweet field.

18 See Lackey v. Ohio Oil Co., 10 Cir., 138 F.2d 449, 451, and cases cited in Note 4 thereto.

19 United Appliance Corp. v. Boyd, Tex. Civ.App., 108 S.W.2d 760, 764; Willard, Sutherland & Co. v. United States, 262 U.S. 489, 493, 494, 43 S.Ct. 592, 67 L. Ed. 1086; Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, 631; Vitagraph, Inc., v. Liberty Theatres Co., 197 Cal. 694, 242 P. 709, 713; International Shoe Co. v. King, 186 Ark. 799, 56 S.W.2d 171, 172; Miller v. Thomason, 229 Ala. 267, 156 So. 773, 774.

36

tracted exceeded the permitted amount .08 of one per cent, or an inconsequential amount. There was neither pleading nor proof that Phillips at any time utilized gas for plant fuel in excess of the percentage permitted as reflected by the curves and standard table. It must, therefore, be presumed that Phillips had a volume of residue gas available for return to Saulsbury's leases after the extraction of gasoline and the use of gas for plant fuel equal to the volume which it contracted to return. None of the residue gas was in fact returned to Saulsbury for development and operation of its leases.

 After the natural gasoline was removed from the commingled gas at the plants of Phillips referred to above, it was transported to Borger, Texas, where it was subjected to a fractionating process and the butanes and propanes were removed therefrom. From 1933, Phillips had extracted natural gasoline containing butanes and propanes in its extraction plants. Under the casinghead gas contracts, Phillips was not limited to the extraction of gasoline. They provided that the gas was to be sold and conveyed to Phillips for the purpose of manufacturing therefrom "gasoline or such other product or products as may be manufactured at Buyer's plant." We think the butanes and propanes were constituent elements of the natural gasoline extracted from the gas, but even if the butanes and propanes may be considered separate and distinct products from the natural gasoline, since they were extracted by a normal operation of the plants of Phillips their extraction was permitted by the terms of such contracts. It is true that by improvement in its process Phillips increased the amount of butanes and propanes recovered but such contracts did not prohibit it from improving its process. We accordingly hold that Phillips was entitled to process the gas and remove therefrom the natural gasoline and other products extracted under a normal natural gasoline extraction process, so long as it kept within the limitation fixed by such contracts as reflected by the curves and the standard table.

### 5. *Waste.*

Art. 6008, Vernon's Ann.Tex. Civil Stat., provides that any person in possession of any well producing natural gas only, in order to prevent waste, shall, within ten days after encountering such gas, confine such gas in the well until it can be utilized for light and fuel. It provides, however, that in all common reservoirs or pools consisting of more than 300,000 acres where gas is encountered for which there is no reasonable market for light or fuel available, the same may be utilized for other purposes including the manufacture of natural gasoline to the extent of twenty-five per cent of the open flow of the well producing such gas, and that under such circumstances such utilization for purposes other than light and fuel shall not constitute waste.

Art. 6008 was amended by House Bill 266, effective August 1, 1935. As so amended, it provides that the production, transportation, or use of natural gas in such manner, in such amount, or under such conditions as to constitute waste is unlawful and is prohibited.

It further provides that the term waste includes

"(h) The production of natural gas in excess of transportation or market facilities, or reasonable market demand for the type of gas produced.

"(i) The use of natural gas for the manufacture of carbon black without first having extracted the natural gasoline content from such gas.

"(j) The use of sweet gas produced from a gas well for the manufacture of carbon black.

"(k) Permitting any natural gas produced from a gas well to escape into the air before or after such gas has been processed for its gasoline content. * * *" § 3.

It further provides that after the expiration of ten days from the time of encountering gas in a gas well, no gas shall be permitted to escape into the air and that all gas produced therefrom shall be utilized for the following purposes:

"(1) No sweet gas shall be utilized except for:

"(a) Light and fuel.

"(b) Efficient chemical manufacturing, other than the manufacture of carbon black. * * *

"(3) Casinghead gas may be used for any beneficial purpose, which includes the manufacture of natural gasoline." § 7.

Sections 3(a), (c), and (d) of Art. 6008a, Vernon's Ann.Tex.Civ.Stat., which became effective May 19, 1937, provide:

"Sec. 3. (a) In any common reservoir in this State producing both sweet and sour gas, it shall be unlawful for any person to operate a plant for the extraction of the natural gasoline content of gas in which plant casinghead gas is commingled with either sweet gas or sour gas, or both, or where sweet gas and sour gas are commingled, until such person secures from the Commission a permit authorizing the operation of such plant. It shall be the duty of the Commission to issue such permit when it shall appear that such plant is being operated, and the residue gas from same is and shall be disposed of, in accordance with the provisions of this section. * * *

"(c) Where any such plant in such common reservoir commingles casinghead gas with sweet gas or where any such plant commingles sweet gas with sour gas, it shall be the duty of the Commission to ascertain the quantity of residue gas which is required to be used for fuel purposes in the efficient operation of the plant and also the quantity of residue gas which is required to be returned by the operator of such plant to the leases to which the plant is connected for use as fuel in the operation of such leases. The operator of such plant shall be required to utilize or cause to be utilized for one or more of the uses provided for sweet gas by existing law a quantity of the residue gas from such plant which is equal to the quantity of sweet gas which is taken into said plant for processing, less the extraction loss from such processing, but such operator shall not be credited with use of such residue for plant-fuel or lease-fuel operations in an amount in excess of the quantity of such residue gas found by the Commission to be necessary for the efficient operation of such plant and return to such leases for fuel for lease operations.

"(d) The commingling in any such plant of casinghead gas with sweet gas or sour gas, or both, or of sweet gas with sour gas, except upon the conditions and requirements set forth in Section 3 of this Act, is hereby declared to be unlawful. * * *"

The District Court held that under the Texas statutes it was lawful to vent residue gas into the air at Phillips' extracting plants prior to August 1, 1935, and at the time the casinghead gas contract was entered into respecting the Cubine wells; that it was unlawful to vent into the air residue gas remaining after extraction of natural gasoline from gas derived from dry, sweet wells on and after August 1, 1935, and at the time the casinghead gas contracts were entered into respecting the Haden wells. It concluded that Art. 6008, as it existed prior to the amendment of 1935, was a part of such contract respecting the Cubine wells; and that Art. 6008, as amended, was a part of such contracts respecting the Haden wells, but not a part of the former contract.

It found that from and after May 19, 1937, Phillips held permits from the Commission to use dry, sweet residue gas for plant fuel for the efficient operation of its casinghead gas plants, for fuel for the necessary and efficient operation of leases, and also permits to blow into the air residue gas from its casinghead gas plants in such amounts as was necessary to make deliveries in required amounts to carbon black plants for carbon black manufacture. It found there was no evidence that Phillips violated such permits, used any gas in excess of the permitted amounts or for unauthorized purposes, or at any time violated the commingling statute and held that Phillips was presumed to have complied with such statute and permits.

Accordingly, it held that it was unlawful for Phillips to vent into the air or to sell for the manufacture of carbon black any amount of residue gas from the gas received from the Haden wells from the date of first production in February, 1936, to May 19, 1937, the effective date of Art. 6008a. It concluded that Phillips was liable to account to Saulsbury for the residue gas derived from gas received from the Haden wells vented into the air or sold for the manufacture of carbon black on the basis of 3.75 cents per M. C. F.

We are concerned only with the period prior to May 19, 1937. On this record we must assume that thereafter Phillips complied with the commingling statute and the permits issued to it by the Commission.

Commingling was not expressly prohibited prior to May 19, 1937. Thereafter, it had express statutory sanction and where a plant was being operated in accordance with the commingling statute at the time it became effective, such statute required the Commission to issue a permit authorizing the continued operation of such plant. The commingling statute thus impliedly approved prior commingling where a plant had been operating in accordance with the commingling statute.

The gas from the Cubine wells was processed for the extraction of natural gasoline in the Gray and Lefors plants. These plants were interconnected on the intake side by pipe lines and received their supply of gas from the commingled sweet and casinghead gas. It affirmatively appears from the record that, during the period from August 1, 1935, to May 19, 1937, Phillips utilized for light and fuel purposes a volume of the commingled residue gas from the two plants which equaled or exceeded the total volume of sweet gas processed in such plants.

The gas from the Haden wells was processed for the extraction of natural gasoline in the Pampa and Gray plants. Such plants are interconnected on the intake side and received their supply of gas from commingled sweet and casinghead gas. They were also interconnected on the discharge or residue side. It affirmatively appears from the record that during the period prior to May 19, 1937, Phillips utilized for light and fuel purposes a volume of commingled residue gas from the two plants which equaled or exceeded the total volume of sweet gas processed in such plants, except during the month of February, 1936. During that month an average daily volume of 69,834 M. C. F. of sweet gas in the commingled mass was taken into such plants, and an average daily volume of 65,250 M. C. F. of the commingled residue gas was sold, used in such plants, and returned to the leases for light and fuel uses. Thus, the total volume of sweet gas taken into the plants exceeded the total volume of residue gas for light and fuel purposes by 4,576 M. C. F. per day. However, it is a reasonable deduction from the evidence that the sweet gas was diminished by the extraction of gasoline in excess of 4,576 M. C. F. per day, and there is no evidence warranting a contrary inference.

Sec. 6 of Art. 6008, supra, requires the Commission to make and enforce rules, regulations, and orders for the conservation of natural gas and to prevent the waste thereof, and to require operators to keep records and make reports to the Commission. Pursuant to Sec. 6, the Commission required each gasoline plant operator to make monthly reports reflecting the average daily volume of each type of gas processed in each plant and the disposition of all residue gas. Phillips made such reports to the Commission for each of its plants. The form furnished for such reports by the Commission indicated that sweet, sour, and casinghead gas might be commingled, and that a part of the commingled residue gas might be used for the manufacture of carbon black and a part be vented into the air. The reports made by Phillips to the Commission each month showed on their face that dry, sweet, and casinghead gas were being commingled before being processed in its plants, and that each month a part of the commingled residue gas was being used for the manufacture of carbon black and a part was being vented into the air. At no time did the Commission object to the commingling of gas or to the dispositions made of the commingled residue gas by Phillips.

The residue gas from the commingled mass of casinghead gas and sweet gas was better suited for light and fuel uses than residue gas from sweet gas alone, because of its higher B. T. U. content.

■ We conclude that under the Texas statutes commingling of casinghead gas and dry, sweet gas was permitted, and that an operator of a casinghead gas plant was not guilty of waste so long as he made lawful disposition of the proportion of the residue gas derived from dry, sweet gas and the proportion of the residue gas derived from casinghead gas.

■ Prior to May 19, 1937, Phillips disposed of residue gas for purposes for which sweet gas could be lawfully utilized equal to the proportion of sweet gas in the commingled mass, and made lawful disposition of the proportion of the casinghead gas in the commingled mass. There was no evidence of any unlawful disposition of the proportion of residue gas derived from casinghead gas. We must presume the contrary. It is our conclusion, therefore, that Phillips was not guilty of waste in the disposition of the residue gas prior to May 19, 1937, and that the District Court erred in charging Phillips 3.75 cents per M. C. F. for the residue gas from the Haden wells from August 1, 1935, to May 19, 1937.

### 6. Boosting and Transportation Costs.

The trial court held, and Phillips concedes, that the corporate entities of Phillips Natural and Independent should be disregarded and that they should be treated as departments of Phillips. Hence, the phrase "less any cost of boosting and/or transportation necessary to market such gas" must be construed as the cost to Phillips of such boosting and transportation.

The District Court allowed an average of 2.-58 cents per M. C. F. as the cost of boosting and transporting the residue gas sold by Phillips. In arriving at such cost, the trial court allowed the following items: (1) operating expenses; (2) general expenses direct; (3) retirements; (4) ad valorem and other direct taxes; (5) Federal income, capital stock, social security and unemployment taxes; (6) indirect overhead adjusted to current basis; (7) depreciation.

It disallowed the discount on the preferred stock to Northern and a reasonable return on gross capital employed.

Phillips challenges the disallowance of the last two mentioned items, and Saulsbury challenges the allowance of Federal income and capital stock taxes, indirect overhead, and depreciation.

█ Under recognized accounting practices and the adjudicated cases, depreciation, Federal income taxes, capital stock taxes, and indirect overhead are allowable as costs.[20] The item of indirect overhead adjusted to current basis was in lieu of the overhead ordinarily allowed as an operating expense, and Saulsbury does not question the method used in determining the direct overhead. An accountant employed by Phillips testified that the items allowed by the trial court were reasonable and were necessary costs of boosting and transportation. There was no evidence to the contrary.

█ The item claimed by Phillips of reasonable return on capital is not cost but profit. The booster system and the residue pipe lines had been constructed and were in operation when the casinghead gas contracts involved herein were entered into. We agree with the trial court that it was not an item of cost within the contemplation of the parties.

█ While the contracts under which Phillips agreed to take Northern preferred stock redounded to the benefit of Saulsbury, in that it resulted in increasing the market for residue gas, nevertheless we do not think Phillips was entitled to charge Saulsbury with one-half of the discount. Under the contracts, Phillips was authorized to sell the residue gas. It was not authorized to exchange the residue gas for other property. It is a general rule that the power to sell gives authority to sell for cash only, not to exchange for other property.[21] Saulsbury neither expressly nor impliedly consented to the exchange of residue gas for Northern preferred stock. We are, therefore, of the opinion that Phillips was liable to account to Saulsbury in cash for the selling price, less deductible costs, of the residue gas which Phillips exchanged for Northern preferred stock, and that Phillips is not entitled to deduct the discount on such stock.

### 7. Accord and Satisfaction.

During the period that Phillips received gas from the Cubine and Haden wells, it mailed to Saulsbury each month a statement of the gas purchased during the preceding month which disclosed the volume of gas received, the percentage of residue gas after extraction and plant use, the volume of residue gas available for sale, the amount of residue gas available for sale from each plant, Saulsbury's proportion of the residue gas sold from the plants, and the amounts in dollars and cents received therefor, the gasoline content per M. C. F., the number of gallons, and the average sale price of 26-70 gasoline.

█ Such statements did not disclose that Phillips was selling the residue gas to its subsidiary, Independent, the actual sale price of such gas received either by Phillips or Independent, nor the proper deduction for the cost of boosting and trans-

---

[20] (a) Depreciation

Fairbanks, Morse & Co. v. City of Wagoner, Okl., 10 Cir., 81 F.2d 209, 219; United Railways & Electric Co. v. West, 280 U.S. 234, 253, 254, 50 S.Ct. 123, 74 L.Ed. 390.

(b) Taxes

Galveston Electric Co. v. Galveston, 258 U.S. 388, 399, 400, 42 S.Ct. 351, 66 L.Ed. 678; Los Angeles Ry. Corp. v. Railroad Comm., D.C.Cal., 29 F.2d 140, 146; Consolidated Gas Co. of New York v. Newton, D.C.N.Y., 267 F. 231, 257–259; Oklahoma Natural Gas Co. v. Cor-

poration Comm., 90 Okl. 84, 216 P. 917, 922.

(c) Overhead

Ft. Dearborn Trust & Savings Bank v. Skelly Oil Co., 146 Okl. 179, 293 P. 557, 563.

[21] Woodward v. Jewell, 140 U.S. 247, 253, 11 S.Ct. 784, 35 L.Ed. 478; Hutchings v. Fanshier, 132 Wash. 5, 231 P. 14, 17; City of Cleveland v. State Bank of Ohio, 16 Ohio St. 236, 269, 88 Am. Dec. 445; Trimboli v. Kinkel, 226 N.Y. 147, 123 N.E. 205, 5 A.L.R. 1385.

portation. Such statements constituted an affirmative assertion by Phillips that there were actual sales at a stated amount per M. C. F. and carried the implication that the sales were made at a fair price to a purchaser with whom Phillips had dealt at arm's length. Phillips concealed the fact that the gas was being sold to Independent, its wholly-owned subsidiary. Saulsbury relied upon such statements and was deceived thereby. Saulsbury examined Phillips' books in July, 1938, but did not obtain full knowledge of all the material facts and did not learn the true situation. The foregoing facts were found by the District Court. Such findings are supported by substantial evidence and are not clearly erroneous.

An accord and satisfaction results from a contract, express or implied, between the parties,[22] and occurs only where the parties intended it and mutually assented to it.[23]

Since an accord and satisfaction is dependent on contract and requires a meeting of the minds of the parties, the material facts must be known to both parties to render it effectual.[24]

We think it clear on this record that Saulsbury was not fully apprised of the material facts, and did not, by accepting the checks, intend to enter into a contract of accord and satisfaction.

## 8. *Statute of Limitations.*

The statements furnished Saulsbury by Phillips did not disclose that Phillips was selling the residue gas to its wholly-owned subsidiary. Its statements carried the implication that the residue gas was being sold to an arm's length purchaser. Phillips concealed material facts from Saulsbury. Saulsbury relied upon the statements and was deceived thereby. Saulsbury had no knowledge of its cause of action until July, 1938.

Hence, we conclude that Saulsbury was not barred by limitation or laches.[25]

## 9. *Interest.*

The amount that Saulsbury was entitled to recover on the contracts was unliquidated and uncertain. Hence, interest was only allowable from the date of the judgment.[26]

The judgment is reversed and the cause remanded with instructions to enter judgment in accordance with this opinion.

In designating the parts of the record to be printed, counsel for Phillips failed to comply with the requirements of Rule 13[27] of this court. For that reason, the costs of printing the portions of the record designated by Phillips will be assessed against it. The remaining costs on the appeal and cross-appeal will be assessed against Saulsbury.

[22] Chicago Fraternal Life Ins. Ass'n, Inc., v. Herring, Tex.Civ.App., 104 S.W. 2d 901, 903; Ortiz Oil Co. v. Geyer, 138 Tex. 373, 159 S.W.2d 494, 496; Bates v. Lefforge, Tex.Com.App., 63 S.W.2d 360, 362; McCarty v. Humphrey, Tex. Com.App., 261 S.W. 1015, 1016.

[23] McCarty v. Humphrey, Tex.Com. App., 261 S.W. 1015, 1016; Whepley Oil Co. v. Associated Oil Co., 6 Cal.App.2d 94, 44 P.2d 670, 676–678.

[24] Whepley Oil Co. v. Associated Oil Co., 6 Cal.App.2d 94, 44 P.2d 670, 677, 678; Chicago Fraternal Life Ins. Ass'n, Inc., v. Herring, Tex.Civ.App., 104 S.W. 2d 901, 903; Russell v. Sickles, 306 Pa.

586, 160 A. 610, 611, 612; White Eagle Oil & Refining Co. v. Baker, 200 Wis. 100, 227 N.W. 263, 264; Richardson v. Sibert, 38 Ga.App. 76, 142 S.E. 755.

[25] See 12 O.S.A. § 99, and Art. 5526, Rev.Civ.Stat. of Texas.

[26] Keystone Pipe & Supply Co. v. Zweifel, 127 Tex. 392, 94 S.W.2d 412, 415; Lumbermen's Supply Co. v. Neal, 189 Okl. 544, 119 P.2d 1017, 1019; American Eagle Fire Ins. Co. v. Lively, 142 Okl. 246, 286 P. 797, 799; Laughlin v. Hopkinson, 292 Ill. 80, 126 N.E. 591, 593, 594.

[27] Now Rule 16 of the Revised Rules of November 18, 1943.