HAINES et al. v. PHILLIPS PE-
TROLEUM CO.

Civil Action No. 1267.

District Court, W. D. Oklahoma.

Oct. 31, 1944.

As Modified Jan. 31, 1945.

778

Ray S. Fellows and E. J. Lundy, both of Tulsa, Okl., for plaintiffs.

Rayburn L. Foster and D. E. Hodges, both of Bartlesville, Okl., and E. G. De-Parade, of Oklahoma City, Okl., all of the legal department of Phillips Petroleum Co., for defendant.

VAUGHT, District Judge.

The plaintiffs seek an accounting for money claimed to be due them under the terms and conditions of a casinghead gas contract executed March 18, 1927, between George H. Williams, The Derby Oil & Refining Corporation, and E. A. Haines and Phillips Petroleum Company. The plaintiffs present their claim under four counts.

Under Count I they contend that from July 21, 1929, to December 20, 1930, inclusive, the defendant owned and operated the Alamo Refinery located near the lease of the plaintiffs in Hutchinson County, Texas; that during said period the defendant used at said refinery 72,949,000 cubic feet of residue gas for fuel purposes for which it has never paid the plaintiffs, and that they are entitled to five cents per thousand cubic feet in payment therefor in the sum of $2,507.61.

Under Count II the plaintiffs contend that from December 21, 1931, to January 20, 1936, inclusive, the defendant sold 275,-306,000 cubic feet of residue gas from their lease used for fuel purposes, for which it paid the plaintiffs only one and one half cents, or less, per thousand cubic feet; that the fair and customary market price was five cents per thousand cubic feet, and that by reason thereof, the defendant is indebted to the plaintiffs in the sum of $7,306.70.

Under Count III the plaintiffs contend that the defendant, in accounting to them for costs and receipts in the marketing of residue gas as provided in paragraph 11

of the contract, has charged false and incorrect items of expense, and has not given the plaintiffs credit for the full net profits from the sales of residue gas, and that by reason thereof, the defendant is indebted to the plaintiffs in the sum of $7,370.09.

Under Count IV the plaintiffs contend that under paragraph 6 of their contract the defendant was to pay them "33⅓% of the value of the gasoline content" in casinghead gas purchased; that from August 9, 1928, to and including September 3, 1931, the defendant paid only 25 per cent of the value of the gasoline content in said gas in the sum of $54,717.86; that 33⅓ per cent of the value of the gasoline content in said casinghead gas amounted to $73,944.38, and that by reason thereof, the defendant, under a proper accounting, is indebted to the plaintiff in the sum of $13,218.21.

On March 18, 1927, George H. Williams, The Derby Oil & Refining Corporation and E. A. Haines were the owners of an oil and gas lease on the Southeast Quarter of the Northwest Quarter of Section 22, A & B Survey, Block Y, in Hutchinson County, Texas, and upon said date they, as the seller, entered into a contract with Phillips Petroleum Company as the buyer, by the terms of which it was agreed that:

"1. The Seller sells and agrees to deliver to the Buyer all the casinghead gas now or hereafter produced from all oil wells on the said premises.

"2. The Buyer buys and agrees to accept and pay for all such casinghead gas, subject to the terms and limitations hereinafter set out."

The contract was to continue during the term of the oil and gas lease or extension or renewal thereof, but provided that:

" * * * this contract shall be terminated by either party hereto * * * giving ninety (90) days notice in writing to the other of its intention to terminate this contract, and thereupon this contract shall be terminated."

The terms of the contract, so far as pertinent to the propositions involved, are contained in paragraphs 6, 11 and 18 as follows:

"6. The Buyer agrees to pay to the Seller for the casinghead gas delivered hereunder, a price computed upon the gasoline productivity of such casinghead gas according to the content thereof as determined by field compression tests as hereinafter provided, 33⅓ per cent of the value of the gasoline contained therein, at the Buyer's average selling price for the month during which gas was delivered. * * *"

"11. * * * It is further agreed and understood by and between the parties hereto, that if and when the dry or residue gas remaining after the extraction of gasoline from such casinghead gas shall be more than sufficient for the needs of Buyer in the operation of said gasoline plant, and more than sufficient for the needs and requirements of Seller for the development and operating purposes upon the premises from which the said casinghead gas is produced, then, and in that event, the Buyer shall have the right to sell any and all surplus dry or residue gas so remaining; providing that in the event of sale by the Buyer of any or all of such dry or residue gas, Buyer shall pay to the Seller herein fifty per cent of the net proceeds received from the sale of such dry or residue gas, such payments to be made at the same time and in the same manner as payments for casinghead gas. It is further agreed and understood that as a basis of settlement hereunder for the sale of dry or residue gas belonging to Seller it shall be determined how much dry or residue gas the Seller was entitled to have returned and the amount that actually was returned during the month for which settlement is to be made, and the difference shall be regarded as the amount which the said Seller shall have available for sale from said plant. It is understood and agreed that second party is purchasing casinghead gas from other lessees and lease owners for handling through said gasoline plant; fifty per cent (50%) of the net proceeds from the sale of residue gas shall therefore be distributed to said lessee or lease owners ratably in the proportion as the amount each lessee or lease owner had available for sale bears to the total amount that all lessees and lease owners had available for sale."

"18. The Seller agrees to sell and deliver to the Buyer and the Buyer agrees to accept and pay for, all casinghead gas produced from the lands above described showing a gasoline content of one (1) gallon or more of gasoline per thousand cubic feet of gas, and it is further agreed and understood that the Buyer shall have the option of accepting and paying for all casinghead gas showing a gasoline content of less than one (1) gallon of gasoline per one thousand cubic feet of gas as determined by physical field tests hereinbefore provided for. Pro-

vided, that if the casinghead gas from any well or wells on said lease becomes insufficient in volume or gasoline content, or for any other cause becomes unprofitable for the extraction of gasoline therefrom, the Buyer may at its option cease taking the gas therefrom so long as such condition exists; and it is further provided that if at any time the volume or gasoline content of the gas which the Buyer is able to procure in the vicinity of said gasoline plant, or if any other cause beyond its control shall render the operation of said gasoline plant unprofitable, the Buyer may at its option discontinue the purchase of casinghead gas under this contract."

On May 21, 1932, the contract was amended in certain particulars, but such amendment does not affect in any manner the questions involved.

■■ The contract is a contract of sale and must be so interpreted. Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27. In the opening paragraphs it states the "seller" owns and operates an oil and gas lease producing the commodity it desires to sell, and that the "buyer" is in the business of manufacturing gasoline from casinghead gas and intends to construct a gasoline plant in the vicinity and desires to purchase for use in the plant the commodity produced by the "seller" from said lease. The questions to be determined are purely questions of interpretation of the terms of the contract, and the practical construction given by the parties themselves by their conduct in carrying out the terms of such contract is entitled to great weight in determining the proper interpretation. Saulsbury Oil Co. v. Phillips Petroleum Co., supra.

Questions of law have been raised that must be disposed of before the controversy can be determined.

■ First. The defendant contends that the contracts between John K. Bright and the other plaintiffs are champertous and by reason thereof this action cannot be maintained by the plaintiffs. The plaintiffs contend that even though the contract between them might be champertous, the defendant could not raise the question as a bar to recovery on the cause of action to which it relates. In this contention the plaintiffs are correct.

In Aaronson v. Smiley, 142 Okl. 29, 285 P. 59, 61, the court laid down the rule as follows:

"The trial court was of the opinion that the contract between the plaintiff and the Tulsa Taxpayers' Association was champertous, illegal, and against public policy, but concluded, as a matter of law, that the defendant could not avail himself thereof, and followed the rule which is stated in 11 Corpus Juris, p. 270, as follows: 'Except in one state, the rule is well settled that the fact that there is a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney, or between plaintiff and another layman, in no wise affects the obligation of the defendant to plaintiff. It is the champertous contract and not the right of action itself which the contract avoids, and therefore defendant cannot avail himself of the champertous agreement as a defense to the action.'"

In Burnes v. Scott, 117 U.S. 582, 589, 6 S.Ct. 865, 869, 29 L.Ed. 991, the court said:

"The question raised by the present assignment of error is not whether a champertous contract between counsel and client is void, but whether the making of such a contract can be set up in bar of a recovery on the cause of action to which the champertous contract relates.

"We must answer this question in the negative."

■ Second. The defendant contends that the action of the plaintiffs is barred by the statute of limitations. And the plaintiffs contend that the items the defendant claims as credits on its account are barred by the statute of limitations. Both parties cite numerous authorities to sustain their respective contentions.

This is a written contract of sale wherein the seller agrees to sell and the buyer agrees to buy a certain commodity. The contract provides how it shall be terminated. So far as the evidence discloses, the contract has never been terminated in the manner provided for its termination and is still in effect. The full price to be paid for the commodity is dependent to some extent upon the sale of by-products from the commodity. The evidence discloses, and the defendant is contending, that there are amounts due the defendant and items are still being charged to the account, from the sale of these by-products. This state of facts makes the account between the plaintiffs and the defendant an open, running, mutual account. The date of the last item fixes the time when the statute begins to run, in such a course of dealing. Under

the contract itself the correct adjustment or settlement thereof is determined by the amount of the net proceeds from the sale of the by-products. Until the contract is properly terminated the parties cannot arrive at that figure.

The principle was well stated in Waffle v. Short, 25 Kan. 503 (Reprint page 350) as follows:

"Where there is an open, running, mutual account between two persons, each person does not have a separate cause of action for each separate item of the account, but only the person in whose favor there is a balance due on the account has a cause of action for such balance against the other. The statute of limitations does not run against each item separately, but only against the balance due; and it will commence to run only from the time of making the last item rightfully credited to the party against whom the balance is due. Each item thus credited to the party against whom the balance is due is a payment or part payment, not of any particular item against him, but of the balance due against him, and is, in one sense, a payment or part payment of every item rightfully charged against him in the whole account."

■ The plaintiffs in their first count seek to recover five cents per thousand cubic feet for residue gas used for fuel purposes by the defendant in the operation of the Alamo Refinery from July 21, 1929, to December 20, 1930, inclusive. There is no dispute between the parties as to the amount of such gas so used during this period. The evidence discloses that during this period the defendant had available an ample supply of this character of gas from its own nearby leases to meet the fuel requirements of the Alamo Refinery, for which there was no active market, and the gas was so used only as a matter of convenience. The contract, however, contains these provisions:

"1. The Seller sells and agrees to deliver to the Buyer all the casinghead gas now or hereafter produced from all oil wells on the said premises.

"2. The Buyer buys and agrees to accept and pay for all such casinghead gas, subject to the terms and limitations hereinafter set out."

Under these provisions the defendant was obligated to buy the gas and to pay for the same. There is nothing in the contract that provides for the amount to be paid for the gas so used by the defendant. There-fore, the reasonable value is the yardstick by which such payment should be made. The evidence is quite clear that such gas, at the time, could be procured in the open market at one cent per thousand cubic feet. It follows that the plaintiffs are entitled to recover that value, which, under the facts as disclosed by the evidence, would be the sum of $500.90.

■ Under Count II, the plaintiffs contend, that from December 21, 1931, to January 20, 1936, inclusive, the defendant used a large volume of the residue gas for fuel purposes at its Alamo Refinery, for which it paid the plaintiffs less than the market value. The plaintiffs further contend that the amount paid them for such gas was approximately one cent per thousand cubic feet and that the fair and customary market price for such gas so used was five cents per thousand cubic feet, and that the defendant is indebted to the plaintiffs for the gas so used in the sum of $7306.70.

The gas so taken and used by the defendant was taken and used under the same circumstances and conditions as under Count I. The evidence discloses that the defendant paid for the gas so used the same price it was paying for such gas for other purposes, under the contract, and the price for which such gas could be procured in the open market, in the period covered.

The plaintiffs, therefore, would not be entitled to an additional sum for such volume of gas so used by the defendant, under Count II.

■ The plaintiffs contend in Count III that the defendant has charged false and incorrect items of expense and has not given the plaintiffs credit for the full net profits from the sales of residue gas. The term "net profits" is nowhere defined in the contract. However, there is but one item which the plaintiffs seriously contend should be disallowed. The evidence discloses that the defendant, as shown in its monthly statements with remittances to the plaintiffs, under the peculiar situation in which it was placed in its efforts to sell the by-products from the residue gas, had entered into contracts with other parties for the sale of a by-product known as carbon black. Under the terms of these contracts it was difficult, if not impossible, to make accurate monthly statements and remittances to the plaintiffs. The defendant, in making such monthly statements and remittances, estimated the amounts due to the plaintiffs.

When final settlements were made with those taking the by-product, the defendant discovered it had sustained a loss over the period of time accounted for to the plaintiffs, and it seeks to charge back the proportionate part of such loss to the interests of the plaintiffs, claiming that it has overpaid the plaintiffs.

The plaintiffs could not be concerned in any loss the defendant had sustained in sales of the by-product, if the sales of such by-product were in fact made. That would be at the defendant's risk. The theory of the defendant is that in the over-all picture, its activities in making such sales benefited the plaintiffs by increasing the volume of sales and the plaintiffs should stand their proportionate share of the loss. Such contracts made by the defendant with the carbon black companies were made in good faith, and evidently the plaintiffs profited thereby, for the reason that had not the defendant agreed to accept carbon black in payment for the residue gas there would have been no market for the residue gas, yet, inequitable as it may appear, since the defendant made the contracts without the consent of the plaintiffs and accepted the carbon black as payment for the gas, under the Saulsbury case, supra, the defendant must bear any loss it sustained in the later sale of the carbon black.

In Saulsbury Oil Co. v. Phillips Petroleum Co., 142 F.2d 27, 39, supra, a similar situation was before the court, and the court held as follows:

"While the contracts under which Phillips agreed to take Northern preferred stock redounded to the benefit of Saulsbury, in that it resulted in increasing the market for residue gas, nevertheless we do not think Phillips was entitled to charge Saulsbury with one-half of the discount. Under the contracts, Phillips was authorized to sell the residue gas. It was not authorized to exchange the residue gas for other property. It is a general rule that the power to sell gives authority to sell for cash only, not to exchange for other property. Saulsbury neither expressly nor impliedly consented to the exchange of residue gas for Northern preferred stock. We are, therefore, of the opinion that Phillips was liable to account to Saulsbury in cash for the selling price, less deductible costs, of the residue gas which Phillips exchanged for Northern preferred stock, and that Phillips is not entitled to deduct the discount on such stock."

The plaintiffs, therefore, would be entitled to recover from the defendant in Count III, the sum of $5,685.21 sought to be charged back on this item.

█ In Count IV, the plaintiffs seek to recover from the defendant the sum of $13,218.21, upon the basis that the contract provides that the buyer agreed to pay for the casinghead gas delivered at a price to be computed according to the gasoline content as determined by field compression tests, 33⅓ per cent of the value of the gasoline contained therein, at the buyer's average selling price for the month during which the gas was delivered.

When the character of the gas was determined, it was found that a greater recovery could be had by the use of what is known as the "charcoal test," and the defendant, on August 20, 1928, wrote The Derby Oil & Refining Company concerning the matter, as follows:

"We have a casinghead gas contract on your lease in the SE-NW of Section 22, Block Y, Hutchinson County, Texas. The manner of testing this gas, as set out by the contract, was not the proper test for lean gas and was never so contemplated. Your representative in the field asked that this be revised to apply to this leaner gas and we are very glad indeed to do this. The customary rate in this district, as paid to all the other producers, is 25% of the content as shown by charcoal test. This royalty was the one by which settlement was made last time and the one requested by your representative and, therefore, I am sure satisfactory to your Company. Will you please acknowledge, therefore, the receipt of this letter so that our files will be complete?"

A reply to this letter was made by The Derby Oil Company, under date of August 27, 1928, as follows:

"We have your letter of the 30th, (sic) 1928 in which you offer us 25% of contract as shown by charcoal test for casing head gas on our lease in SE NW of Section twenty-two (22) Block Y, Hutchinson County, Texas.

"Our contract is for one third (⅓) of proceeds from sale of gasoline and gas. This letter calls for one quarter which is acceptable now or until gas complies with regular contract. As long as this gas does not show a gasoline recovery of more than two gallons per thousand, we would prefer

a charcoal test and twenty-five percent of the gasoline content will be agreeable."

The contract provides that the tests were to be made quarterly and that the buyer should notify the seller in writing five days previous to the making of the test in order that the seller might have a representative present when the tests were made. This correspondence indicates that the representative of the seller was present at such a test and suggested the charcoal test, which resulted in the arrangement for the charcoal test and payment to be made under it at 25 per cent. instead of under the field compression test at 33⅓ per cent. as provided in the contract. The evidence discloses that under the charcoal test, which was more expensive to the buyer, the seller received larger returns than could have been received under the field compression test and profited by the change. The buyer also profited by the change, but the seller cannot complain for he suffered no damage thereby.

There appears to be no merit in the contention of the plaintiffs under Count IV, and the court holds they are not entitled to recover thereunder.

Findings of fact, conclusions of law, and a proper form of judgment consistent with this opinion may be submitted within fifteen days from this date. Exceptions are allowed the parties.