# Central Kentucky Natural Gas Company v. Williams et al.

## Same v. Wright.

(Decided Feb. 28, 1933.)

KIRK & WELLS and HAROLD A. RITZ for appellant.
FRED HOWES for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

The pleadings, evidence, and questions of law presented on these two appeals are identical. M. K. Williams and Marion Wright, respectively, owned land in Johnson county, Ky. Each of them leased his land to different lessees, for oil and gas. The Williams lease was executed in 1922 for the consideration of $800 cash. It contains the customary and usual provisions found in such leases. Wright's lease was executed and delivered September 26, 1916, and contains substantially the same provisions. The Central Kentucky Natural

Gas Company acquired title to the leases and began to develop them in about the year 1922. On the Williams land three producing gas wells were drilled, and three on the Wright land. The cost of drilling and equipping the wells on the Williams lease was in excess of $19,000, and on the Wright lease it was more than $9,000. The average rock pressure of the wells when first drilled was 119 pounds per square inch. At the institution of these actions it was reduced to about 21 pounds per square inch. The average thickness of the gas sand is about 31 feet. There are about 600 acres embraced in the gas field known as "the Red Bush field," in which the Williams and Wright leases are located. The Williams land is on the outer edge of the field. The Williams lease recites that the acreage leased was "225 acres, more or less." By actual survey it was found to contain 129.27 acres. The Wright lease was for 75 acres, more or less. In his testimony Wright states that he owned more land than the 75 acres, but intended to lease only 75 acres. By actual survey his entire tract contains 83.88 acres. Neither of the leases contained express covenants with reference to the drainage of the gas or oil thereunder from the development of the adjoining lands. The wells on the land of Williams and Wright produced gas in paying quantities, but no oil. They have been operated, the gas marketed, and the royalty paid to lessors as per the terms of the lease, by the Central Kentucky Natural Gas Company, continuously since the wells were drilled and equipped. Wright resided during the period of operation on his land or in the vicinity of it. Williams resided at Portsmouth, Ohio, but was frequently in the vicinity of the wells while they were being operated. The royalty of Wright was paid to him annually according to the pressure shown by a test of his wells, and Williams was paid annually $150 per well.

In September, 1930, both of them caused to be delivered to the Central Kentucky Natural Gas Company written notice stating in substance that wells already drilled by it were wholly inadequate and insufficient to develop the oil and gas resources underlying their respective land; that the wells did not protect them against drainage by the wells located on adjacent lands; and that their land had been thus depleted of its gas resources. It was also stated in the notice that unless a certain number of wells were drilled on their respective

land within a reasonable time after the service of the notice, an action would be filed for a cancellation of the leases. The Central Kentucky Natural Gas Company refused to drill additional wells. These actions were instituted to cancel the leases. Issues were formed by appropriate pleadings and evidence was taken thereon. An amended petition was filed by each of them, in which it was stated that the evidence tends to show that it was not profitable to drill any more wells. This statement is followed by allegations that the gas under the leased land had been negligently and fraudulently extracted or turned into adjacent wells for six or eight years, and thereby depleted of its gas; that the territory immediately adjoining their land was so drilled as to allow no more than 20 or 25 acres to each well. Wright in his pleading insists that he is entitled at least to three more wells in order to accomplish reasonable development to protect gas resources underlying his land against drainage and depletion. Williams makes the same allegation in his amended petition, and charges that four more wells were required to protect his lease from similar drainage. After the evidence was completed, both of them offered a second amended petition in their respective actions in which it is claimed that the lessor did not know, and did not have any information or notice, of the depletion and exhaustion of the gas under their respective land until the introduction of the evidence. It was charged that it was the duty of the Central Kentucky Natural Gas Company to protect his land from drainage into adjacent wells and that adjacent wells were drilled in close proximity to his land, but that it had failed to protect his land from such drainage.

By its answer the Central Kentucky Natural Gas Company traversed the petitions and amendments thereto and affirmatively alleged such facts as it conceived to be necessary to constitute an estoppel. The gas in "the Red Bush field," including that produced on the land of both Wright and Williams, was about exhausted, at the institution of the actions. When the wells were first drilled they produced gas in paying quantities, but production has so decreased that not much profit is derived from their present operation. For Wright, it is shown that the wells on the adjoining premises are a distance of 641 feet, 273 feet, and 327 feet from Wright's property line. The well designated

246

No. 1 on Wright's land is 1,869 feet from No. 2; from No. 3 to No. 1 it is 2,050 feet.

The wells on the land adjoining that of Williams are, from the Williams property line, 416 feet, 775 feet, 371 feet, 320 feet, 348 feet, 750 feet, 436 feet, 278 feet, 750 feet, 484 feet, and 732 feet. A map is filed showing the locations of the three wells on the Wright land, and by it one well is located 370 feet from the line of the adjoining property, and 460 feet from the line of the opposite adjoining property. Another one of his wells is located 240 feet from the adjoining property and 220 feet from the adjoining property. A third well is located on his land, 603 feet from the adjoining property line on one side and 490 feet from the adjoining property line on the other.

One well on the Williams land is located 310 feet from the adjoining property line on one side and 330 feet on the opposite side. Another well on Williams' land is located 682 feet from the adjoining property line, and the third well is located 657 feet from the adjoining property line on one side and 670 feet on the opposite side.

It is observed that both Wright and Williams, in their respective petition and amendments thereto, claim that for a proper development of his land not more than 20 to 25 acres to each well should have been allowed by the lessee. It is shown in their behalf that "the Red Bush Field" was overdeveloped. By a driller, they attempt to establish a custom prevailing in the field to allow as small an acreage as 15 to 20 acres to the gas well. For the Central Kentucky Gas Company, it is fairly established by testimony of engineers, geologists, superintendents of gas companies, and other men of years' experience in the production and marketing of gas, including J. T. Hare, a witness introduced by Wright and Williams, that as much as 75 acres per gas well is proper development. It is shown by the testimony of Hare that the three wells were an adequate, proper, reasonable, and sufficient development considering the development and operation of the adjoining leases. Wright and Williams made no attempt to show the quantity of gas that was drained from their respective lands by the wells on the adjoining lands. A number of adjoining wells were owned by companies other than the Central Kentucky Natural Gas Company; a

few were owned and operated by it. Tests of the wells operated on their land were made each month, but the evidence leaves it entirely to inference as to the quantity of gas drained by the operation of the adjoining wells. It is apparent that the wells on the adjoining land drained gas from the land of Wright and also of Williams. It is equally as true that the wells on their respective land drained gas from the adjoining lands. As to the excess, if any, thus drained from the one to the other, is a mere matter of surmise or conjecture, without evidence tending to show the facts. A mere surmise or conjecture is not sufficient to supply the premise upon which to base a judgment. North American Accident Ins. Co. v. West, 245 Ky. 316, 53 S. W. (2d) 692. Neither Wright nor Williams offered any evidence bearing on the question. Viewing the location of the wells on both the land of Wright and Williams as they are shown by the maps, which are not disputed, if a well is located on either tract, allowing 75 acres to the well, considering its area in the form of a circle, the diameter thereof is 123.6 rods. If 60 acres be allowed to the well, the area in the form of a circle, the diameter is 110.56 rods. If an area of 50 acres be allowed, 100.92 rods is the diameter. If 40 acres be allowed to the well in the form of a circle, the diameter is 90.2 rods. Conceding that 75, 60, 50, or 40 acres is allowed to the well on their land, and also on the adjoining land, the drainage as a matter of course would be the same in every direction from the well, and therefore the drainage of gas from the adjoining premises into the well on the land of Williams or Wright would unavoidably drain the gas from under their land. Without some evidence tending to show the difference in the quantity of the drainage, if any, under the circumstances, a finding that the gas under Wright's or Williams' land which was drawn into the wells on the adjoining land exceeded in quantity that which was drawn by the wells on their land, would be mere conjecture, insufficient upon which to base a judgment. It is never presumed that the lessor intends to permit gas or oil on his land to be withdrawn from it otherwise than through wells drilled on it under his lease and thus let it go to the lessee, or another, operating adjoining premises, as an incident to his procurement of a smaller rental. A lease contemplates the extraction of oil or gas through wells on the leased premises. Where there is no express covenant

in the lease, the doctrine of implied covenant protects the lessor from drainage or against a failure or refusal adequately to develop the leased premises. Jennings v. Southern Carbon Co., 73 W. Va. 215, 80 S. E. 368. A different rule prevails in case the premises are not developed or the lessee ceases to develop them, from that where they are being operated, or on which wells are being drilled, and drainage is occurring. To entitle the lessor to further development in the first instance, he is required to give notice, plain and unequivocal in its meaning, of an unconditional demand to go forward and develop, within reasonable time after the giving of the notice. Lawrence Oil Corporation v. Metcalfe, 241 Ky 353, 43 S. W. (2d) 986, and cases cited; Leeper Oil Company v. Rowland, 239 Ky. 295, 39 S. W. (2d) 486, and cases cited. Or where the lease is for a specific term and imposes an alternative duty upon a lessee to drill a well within a specified period or pay a specified rental for delay and provides for like postponement of development within the terms of the lease, there is no implied covenant within the period of postponement to drill offset wells on the leased premises for the prevention of the loss of gas or oil by drawing through wells on adjoining or neighboring lands. A lessor is not entitled to recover damages for failure to drill off-set wells to prevent drainage while the lessee exercises his option to pay money in lieu of drilling and the lessor accepts it, until notice is given by the lessor to the lessee during this period of delay, and a like demand to drill an offset well is made of the lessee. The right of the lessor during such period of delay falls within the general rule controlling the right of the lessor to give notice and demand that the lessee go forward as stated in the cases supra. During the time the lessee is entitled to exercise his right to pay money in lieu of drilling, and the lessor accepts it, the exclusive remedy of the lessor is to give notice and demand offset wells. Thornton on Oil & Gas Leases (4th Ed.) vol. 2, sec. 518, p. 850; section 3766b-4c, Ky. Statutes; Lawrence Oil Corp. v. Metcalfe, 241 Ky. 353, 43 S. W. (2d) 986, 989. Where adjoining premises are operated or wells are being drilled, whether by the same or different operators, the doctrine of implied covenant imposes the duty upon the lessee, or owner of the lease, to protect the lessor against drainage from wells on the adjoining premises, and on default thereof the lessor may recover

damage. Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430, and cases cited; Lawrence Oil Corp. v. Metcalfe, supra.

But to recover damage resulting from drainage of gas or oil into wells operated on adjoining premises, it is incumbent upon the lessor to allege and prove that the lessee, or the owner of the lease, by negligence permits the drainage. Another way of expressing it is that the lessee or the owner of the lease must act in good faith, and as an ordinarily prudent operator. Good faith alone is not sufficient. It is an essential, and is sufficient only when accompanied by the exercise of that degree of diligence usually exercised by an ordinarily prudent operator. In Lawrence Oil Corp. v. Metcalfe, supra, the rule was thus stated:

> "The extent and measure of the covenant has been subjected to various tests, but the better rule is that both parties are bound by the standard of what is reasonably required by the exigencies of the particular case. Merrill, 'Covenants Implied in Oil & Gas Leases,' secs. 87, 88, pp. 217-219; Mills & Willingham on the Law of Oil & Gas, sec. 112; Thornton, Law of Oil & Gas (4th Ed.) sec. 149D; Swiss Oil Corporation v. Risner, 223 Ky. 397, 398, 3 S. W. (2d) 777; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801."

In different phraseology the rule was enunciated in Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801, 814, in this language:

> "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to * * * both lessor and lessee is what is required. A plain and substantial disregard of this requirement constitutes a breach of the covenant for the exercise of reasonable diligence."

A co-ordinate rule is that the honest opinion of the lessee that the lease cannot be operated profitably or protected from drainage is entitled to more weight than the opinion of the lessor, or the experts or the judge who tries the case, or all combined, in the absence on his part of fraud or bad faith. Thornton on Oil & Gas Leases (4th Ed.) sec. 173, p. 299. The terms "good

faith," "bad faith," "fraud," "ordinary prudence," and "negligence" must be given the same meaning in such cases as they are given by the text-writers and the courts in other cases involving contracts. Neither of these terms will permit a lessee under the guise of ownership of the adjoining premises, drain land he has leased, by sinking wells on such premises, and not put down a sufficient number of wells on the leased land as will protect it from wells operated on such adjoining territory when the lessor at least receives his compensation by royalty or a part of the oil produced or a rental of so much producing well. Thornton on Oil & Gas Leases, sec. 175, p. 301.

Ordinarily, unexplained, if the lessee operates adjoining lands and a well is placed on one of them so close to the line between them that it drains both alike, and he fails to sink a well on the other to offset the well he has already drilled on the first, the owner of the latter is entitled to damage for the drainage.

The measure of damage recoverable for the drainage is difficult to ascertain and determine. The testimony of witnesses acquainted with the gas field, and whose experience and training qualifies them to testify with reasonable certainty and correctness as to the number of wells which should be drilled on the leased land for protection from drainage, may establish the required facts to support a recovery. It is universally recognized that where it may be established with reasonable certainty and correctness, the quantity of oil or gas drained by a well or wells on adjoining land, the quantity depending on the character of the porosity of the formation in which the product is found, the lessee or the owner of the lease is liable for, and the lessor may recover of him, the value of the gas or oil taken by the well or wells drilled so near his property line as to draw off gas or oil underneath his land. The difficulty of ascertaining and determining the quantity of the drainage does not forbid nor prevent a recovery. Blair v. Clear Creek Oil & Gas Co., supra; and Culbertson v. Iola Portland Cement Company, 87 Kan. 529, 125 P. 81, Ann. Cas. 1914A, 610; Carroll Gas & Oil Company v. Skaggs, 231 Ky. 284, 21 S. W. (2d) 445. The measure of recovery is the royalty fixed by the particular lease. Steel v. American Oil Dev. Co., 80 W. Va. 206, 92 S. E. 410, L. R. A. 1917E, 975.

The evidence abundantly establishes that the lessee has properly and fully developed the land of both Wright and Williams, and also in good faith exercised that degree of diligence which ordinarily prudent operators generally exercise. There is a total failure—in fact, there was no attempt made—to show that the quantity of gas drawn from under their respective land was greater than that which the wells on the adjoining lands drew from their land, and vice versa. It is a general rule that this court gives great weight to the judgment of the chancellor. Recognizing it, but reviewing the evidence for ourselves, it is our conclusion that the judgment of the chancellor is contrary to the preponderance of the evidence. Neither Wright nor Williams has manifested his right to a recovery. The judgment will be entered dismissing their petition, and for proceedings consistent with this opinion.