**LAFITTE COMPANY, Plaintiff,**

v.

**UNITED FUEL GAS COMPANY, Defendant.**

**No. 379.**

United States District Court
E. D. Kentucky,
Pikeville Division.

Aug. 7, 1959.

Eli H. Brown, III, Marshall Eldred, William G. Hume, Edward S. Bonnie, Louisville, Ky., J. W. Howard, Prestonsburg, Ky., for plaintiff.

C. E. Goodwin, Herbert W. Bryan, H. L. Snyder, Jr., Charleston, W. Va., J. Peyton Hobson, Jr., Pikeville, Ky., for defendant.

SWINFORD, District Judge.

The plaintiff seeks an accounting, declaration of rights, and damages, growing out of an alleged violation on the part of the defendant of its covenants and obligations as lessee under an oil and gas lease on properties in Floyd and Knott Counties, Kentucky, owned by the plaintiff, lessor.

On October 3, 1924, the Elk Horn Coal Corporation executed a lease to the Ohio Fuel Oil Company for the working interest in 14,983 acres of land, which was a part of a tract in Eastern Kentucky and identified throughout the record as the "Checkerboard" area. The whole Checkerboard area contained 42,880 acres. It is important, and a circumstance considered by the court, to identify the various owners of the respective interests through which, by mesne conveyances, the litigants acquired their interests.

The plaintiff is a successor in title to the original lessor. The defendant is a successor in title to the original lessee. On April 20, 1932, the Elk Horn Coal Corporation conveyed its interest to Louisville Gas Royalties, Inc.; Louisville Gas Royalties, Inc., to Producers Pipe Line Company, August 2, 1932; Producers Pipe Line Company to First National Bank and Trust Company of Lexington, Kentucky, June 21, 1945; First National Bank and Trust Company to The Lafitte Company (plaintiff), March 1, 1946. There was also a deed from Producers Pipe Line Company to The Lafitte Company, dated February 23, 1955 (Exhibit No. 115).

The original lessee conveyed its interest to the Warfield Natural Gas Company, November 1, 1928. The Warfield Natural Gas Company conveyed the interest to the United Fuel Gas Company (defendant), December 26, 1946.

The plaintiff asks judgment in the sum of $767,648.50 as damages resulting from alleged violations of the terms of the lease. It is agreed that the rights and obligations of the original parties to the contract are identical with those

of the present parties, which are in accord with the terms of the lease (paragraph 26).

The plaintiff's claims are as follows: (1) Failure on the part of the defendant to remit to the plaintiff the correct amount of royalty as dictated by the terms of the lease; (2) failure on the part of the defendant adequately to develop the property resulting in drainage of gas from beneath the premises by foreign gas wells on adjoining premises; (3) failure on the part of the defendant to remit to the plaintiff its one-eighth part of the proceeds received from the sale of by-products manufactured from gas taken from the leased premises by the defendant.

The defendant, by its answer, denies most of the material allegations of the complaint and pleads affirmatively the defenses of payment, accord and satisfaction, laches, estoppel, and the Kentucky five-year and fifteen-year statutes of limitations, KRS 413.090, 413.120.

Before proceeding to discuss the terms of the lease and the rights of the parties thereunder, it is proper for the court to say that it does not consider the lease ambiguous and all evidence contained in the record which purports to explain the terms of the lease because of conceived ambiguity is incompetent and not considered by the court in its decision.

The plaintiff rests its case upon the construction and interpretation of Paragraphs (2) and (8) of the lease which provide that in consideration of the premises, the Lessee covenants and agrees to deliver to the credit of the Lessor, its successors or assigns, free of cost, in the pipe line to which Lessee may connect its wells "(2) * * * one-eighth (⅛) of the gross income received by the Lessee from the sale or disposition in whatever manner and for each and every purpose, of gas produced and sold or marketed in its natural or reduced state from the demised premises.

"Also one-eighth (⅛) part of the proceeds received from the manufactured by-products of natural gas if said natural gas be manufactured into by-products by the Lessee or its assigns less the Lessor's proportionate part of the transportation charges. Said transportation charges to be the delivery cost of said by-products from the point of manufacture to the place of sale or market, it being the intention and purpose that the Lessor is to receive the one-eighth (⅛) part of all monies received by the Lessee from the sale of the gas from the demised premises whether sold in its natural state or sold after the extraction of the by-products of the natural gas and also one-eighth (⅛) of the proceeds of said by-products as above set out. The Lessee agrees that it will sell the gas produced by it from the leased premises hereunder and the by-products thereof, herein mentioned for not less than the fair wholesale market value of the same in the vicinity thereof at the time of making any contract for the sale of the same, or any part thereof, and that any contract for the sale of same shall contain such provisions as will reasonably insure to the Lessor the fair wholesale market value of its part of same throughout the term of said contract. Every contract for the sale of gas from the leased premises, as well as the by-products thereof, shall be fairly made; it being the agreement and intention of the parties hereto that the said gas and by-products thereof shall be marketed upon such terms as will enable the Lessor to obtain at all times the fair value of the same in the open market. If, however, lessee sells the natural gas or any product thereof mentioned in the foregoing paragraph, either to itself or to any subsidiary corporation owned or controlled by it, the price of such gas or product for which the lessee shall be accountable to the lessor shall be at the lessor's option— either the contract price therefor, or the fair, wholesale market price thereof in the vicinity where same is produced or sold.

"Should gasoline be manufactured from wells on the premises hereby leased, the lessor shall receive in full payment for such gas so used at its option one-

eighth (⅛) of the gasoline thus manufactured and saved, delivered in tanks provided by the lessee on the premises, but not to exceed a maximum capacity of three hundred barrels, free of expense, and one-eighth (⅛) of the proceeds of sale of the residue or stripped gas if same is sold by lessee; or one-eighth (⅛) of the proceeds of gasoline if sold by lessee, less the cost of marketing same, and one-eighth (⅛) of proceeds of gas sold, payable to the lessor monthly.

"Settlement and payment shall be made by the Lessee monthly not later than the 20th day of the following month, for all gas and by-products produced from the demised premises and used or disposed of by the Lessee during the preceding month. * * *

"(8) In the event oil and gas, or either, shall be found in paying quantities on the leased premises, the Lessee shall proceed to market the same with all reasonable dispatch, and after a well has been connected with a pipe line, it is understood and agreed that the extraction of gas or oil from any such well shall be prosecuted continuously with reasonable diligence so long as the capacity is such as to make such production profitable, so far as consistent with marketing conditions, and the Lessee shall not discriminate against the oil or gas wells on the demised premises in favor of any other oil or gas well operated by the Lessee in marketing gas and oil, or either, from oil and gas wells operated by the Lessee in the vicinity or adjacent to said demised lease."

■ In construing these portions of the lease the whole contract must be considered. The court has placed considerable emphasis upon the following which I paraphrase rather than quote for the sake of brevity: (3) The gas taken from the premises shall be measured by orifice pitot tube or meter of other standard type, to be furnished by the lessee. (4) The lessor to furnish on the premises sites where the meter or meters may be located and maintained. (5) The lessee shall read the meters daily or as often

as the meters require, but each party shall have constant access to the meters. At the end of each month a statement shall be rendered to the lessor, showing the amount of gas taken in that month. (6) The statements on meter measurements are to be rendered by the lessee to the lessor at the end of each month, and shall be conclusive on the parties thereto, unless exceptions in writing shall be made by the lessor and mailed to the lessee within ten days after the lessor receives the statements. (7) The lessee further agrees to keep all proper records to enable a correct determination of the quantity of gas and oil and by-products marketed or delivered to the lessor's credit in pipe lines or otherwise, to which records the lessor, or its duly authorized agent, shall have access at reasonable times for the purpose of verification of statements furnished by the lessee to lessor. (16) The payment of all royalties deemed and treated as rents, the lessor to have all remedies for the recovery thereof given by law for the recovery of rents, but such remedies to be cumulative and not exclusive.

These paragraphs and sections and other numbered paragraphs and sections of the lease will be referred to throughout this opinion.

The original lessee went upon and proceeded to develop the leasehold in accordance with the terms of the lease. The first development was in 1925. The first fifteen gas wells were developed and gas brought into production, with continuing development, without any controversy or disagreement between the original parties or their successors and assigns for a period of more than twenty five years. The differences between the parties which resulted in the bringing of this action arose in the following way.

On January 31, 1951, the defendant wrote a letter to the plaintiff in which it stated that the wholesale market price of gas had, for the past years, been 12¢ per Mcf and it proposed to increase the price to 15¢ per Mcf, effective January 1, 1951. The letter also made a request that certain changes in the lease be agreed to

with reference to meter readings and asked the plaintiff for its approval of such a change. The letter was acknowledged by an official of the plaintiff but no consent to change was granted. Evidently the letter of January, 1951 prompted the present officials of the plaintiff company to reexamine the lease of October 3, 1924 and a controversy arose as to interpretation of its terms which could not be settled between the parties.

I will consider the plaintiff's claim on the three grounds set forth above and in the order stated.

The lease provides no set price for the gas so the consideration must be judged from Paragraph 2 which gives one eighth of the gross income on the wholesale market price in the vicinity where the gas is produced or sold. It will be noted that the words "produced" or "sold" are intended to be used synonymously. I do not consider this an ambiguity in the light of the whole context of the contract. It prompts, as the first determination in this matter, a finding of what is, or was throughout, the wholesale market price in the vicinity of the Checkerboard area.

By the terms of the lease, meters were to be located on the leased premises by the lessee and maintained by the lessee during the term of the contract. The lessee bought gas from various producers, gathered and commingled it, and delivered it to a terminus, which was off the leased premises, for distribution through pipelines to various points of consumption throughout the country. It was undoubtedly the intention of the parties at the time the lease was executed that the gas was to be measured at the wellhead and not at some distant point of sale to a subsidiary of the lessee or a stranger. There would have been no point in putting meters at the wellhead if their measurements carried no significance. The original lessee neither owned nor operated gas transmission lines. It sold gas originally to Ivyton Oil & Gas Company, a subsidiary of the Louisville Gas and Electric Company, which constructed pipelines into the Checkerboard area and bought gas from the original lessee at the wellhead for 12¢ per Mcf. The original lessee, the Ohio Fuel Oil Company, also sold gas to the Warfield Natural Gas Company in 1927 and 1928. Warfield built pipelines into the Checkerboard to the wellhead where the gas was measured and sold for 12¢ per Mcf. On November 1, 1928, Ohio Fuel Oil Company merged into Warfield. From the time of the execution of the lease in October 1924, until the end of its existence, Ohio Fuel Oil Company made all the sales from the leased premises to the gas companies who built gathering lines up to the wellheads where the gas was measured and delivered to the purchaser.

By the merger of Ohio Fuel Oil Company with Warfield, Warfield then became the owner of the gathering and transmission lines which it had constructed in 1927 on the leased premises to the wellheads. The lessor, Elk Horn Coal Corporation, was fully advised of the merger and executed a right of way agreement to Warfield to enable Warfield to market gas from several wells on the leasehold.

The exhibits disclose that there was considerable correspondence between the management of Elk Horn and Warfield and that the lessor kept a careful check on the gas production. It also continued to accept royalties based on the value of the gas produced at the wellhead.

It can be pointed out here that the original lessor and all of its successors in title accepted the wellhead measurements and the price of 12¢ per Mcf without question and, as the record clearly discloses, with full knowledge of the price for which the lessees in succession were selling the gas, until discussions arose in 1951 after the plaintiff had received the letter of January 31 of that year.

No question of the royalty clause was raised until January 23, 1952. The plaintiff continued to accept the royalties tendered until September 1954. The royalties were paid on a monthly basis at the rate of 1.5¢ per Mcf, which is one eighth of 12¢ per Mcf, for all gas produced be-

fore January 1, 1953, at which time the rate was increased to 2¢ per Mcf. On the back of each check appeared the following: "In full payment for all claims of royalty, on certain oil and gas lease described hereon, for the ——— month ended ———". With each check was an accounting letter setting forth in detail for each meter the amount of gas on which royalties were being paid.

As early as 1942 the lessee had furnished to the lessor records of the individual wells, logs, line pressures, days on line, and which wells were hooked to each meter, and other information. It was the practice between the parties for the lessee to furnish any information requested by the lessor of anything pertaining to the property covered by the lease. Between 1942 and 1944, an accountant for the lessor visited the home office of the lessee on more than one occasion and there was made available to him all records of the lease pertaining to the matters of the lease and the sale of gas from the wellhead.

Another fact disclosed by the record is that the odd numbered blocks (the Lafitte property) in the Checkerboard area have produced, under the development of the defendant, thirty five billion cubic feet of gas, for which there has been paid to the plaintiff and its predecessors approximately $550,000. It should also be pointed out that by a provision of Paragraph 6 of the lease, statements on meter measurements were to be rendered by the lessee at the end of each month, which the record discloses has been done, and such report shall be conclusive on the parties thereto unless exceptions in writing are made by the lessor within a prescribed time.

The plats on all wells developed by the defendant were in possession of the plaintiff and many of the monthly statements and computations of royalties to the lessor were checked by the accountants for the plaintiff, according to the testimony of Carl Morrison who served in an administrative capacity for the Producers Pipe Line Company from 1935 to 1951.

The plaintiff states in its original brief, "the sole issue is one of law based on a judicial interpretation of the royalty provisions of the lease." The defendant states in its original brief, "a key issue in this case is the proper interpretation of the gas royalty clause in the Lease." With these statements from opposing sides I am in agreement. The thrust of this case lies in the determination of whether the lease binds the lessee to pay one eighth of whatever gross income the lessee may ultimately receive from its buyer, at whatever place, either on or many miles from the leasehold, or whether, as the defendant contends, the clause in the lease is simply an open-end gas royalty clause, with the value of royalty per Mcf to be determined at the wellhead.

Not only on this particular phase of the case, but on the other two points later to be discussed, it must be borne in mind that the burden of proof is always on the lessor to show his damages by lessee's failure to perform his obligations under the terms of the lease. Carroll Gas & Oil Co. v. Skaggs, 231 Ky. 284, 21 S.W.2d 445.

It is an accepted rule of law that where there is any ambiguity in the contract with respect to the provisions relating to royalty payments, the conduct of the parties over the years is entitled to great weight. Air King Products Co. v. Hazeltine Research, D.C., 94 F.Supp. 85. Although I have stated and hold that this contract is not ambiguous, it is permissible to consider the situation of the parties and the accompanying circumstances at the time the contract was entered into—not for the purpose of modifying or curtailing its terms, but to aid in determining the meaning to be given to the agreement. The court puts itself in the position the parties occupied at the time the contract was made and from that position interprets the words or acts of the parties as significant in the construction of the instrument. Restatement of the Law of Contracts, Vol. I, Sec. 235(d), p. 324.

■ The practical construction given to the contract by the parties as evidenced by their conduct is entitled to great weight in determining its proper interpretation. Insurance Co. v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27; Lackey v. Ohio Oil Co., 10 Cir., 138 F.2d 449; Haines v. Phillips Petroleum Co., D.C., 58 F.Supp. 777.

The applicable rule is best expressed by a quotation in the opinion in the case of Air King Products Co. v. Hazeltine Research, D.C., 94 F.Supp. 85, 92:

"In Carthage Tissue Paper Mills v. Village of Carthage, supra, 200 N.Y. 1, at page 14, 93 N.E. 60, at page 64, it is said: 'Practical construction by uniform and unquestioned acts from the outset, especially when continued for a long period of time, is entitled to great, if not controlling, weight, for it shows how the parties who made the contract understood it. If they do not know what they meant, who can know? Such a construction is presumed to be right, because it was made by the parties themselves when under the influence of conflicting interests. This is true whether the construction is by contemporaries or their successors * * * ' ".

Not only is the conduct of the parties with respect to the matter of accepting the monthly royalty payments over a period of more than twenty five years significant, but it must be borne in mind that the lease was transferred on three different occasions. It is proper to assume that on each of these occasions the matter of the amount of royalties and the price per Mcf of the gas and the meters at which the amount of gas was to be measured, were taken into careful consideration by both the seller and the purchaser, and that there was on each of these occasions a careful scrutiny and appraisal of the terms of the lease in all its phases and especially to the matter of production and income per Mcf.

In 1932 the original lessor, Elk Horn Coal Corporation, sold the lease to Louisville Gas Royalties, Inc. Before the sale Elk Horn had a study made of the property by Ford, Bacon & Davis, an independent engineering company. In 1932 Producers Pipe Line Company was organized primarily for the purpose of purchasing the lease from Louisville Gas Royalties, Inc. The stockholders and officials of Producers Pipe Line Company were men of experience and great wealth. They had numerous meetings wherein the Checkerboard area was discussed and the nature and extent of the lease which they were considering buying. A copy of the report of Ford, Bacon & Davis, analyzing all of the questions about the situation in Eastern Kentucky in relation to the gas production, was submitted for their scrutiny and examination.

The men who were organizing Producers Pipe Line Company were General J. Fred Miles and Mr. James C. Ellis, both of Kentucky. They had as their attorney, Mr. Eli Brown Jr. I do not consider it dehors the record for the judge of this court to say that it is doubtful if three more astute, farsighted and experienced business men could have been found in 1932 or at any other time in this state. General Miles and Mr. Eli Brown III have been with The Lafitte Company, the plaintiff, since its organization and when it purchased the lease in question in 1946. It may be inferred that the same careful scrutiny was again given to this property and its production and income before it was taken over by the present plaintiff.

■ Since the lease does not specify either the place of market or the price to be paid, the lease must be considered an open-end lease and the market value of the gas to be determined at the wellhead. Rains v. Kentucky Oil Company, 200 Ky. 480, 255 S.W. 121. The case of Warfield Natural Gas Co. v. Allen, 261 Ky. 840, 88 S.W.2d 989, seems to be conclusive on this question and therefore binding upon the court in its determination. There it was held that a gas lease which provided for a royalty of one-eighth of the proceeds received from the property, but which did not contain a provision as to

where the lessee was to find a market, was construed to fix the market value of the gas at the place of production although the gas was sold elsewhere at another market and for a higher price.

In Reed v. Hackworth, Ky., 287 S.W.2d 912, the court cites the Rains and Warfield cases in support of its holding that if a lease is silent on the question, royalties should be based upon the market value of the gas at the well.

The lease provides that the gas is to be sold "for not less than the fair wholesale market value of the same in the vicinity" of the leased premises. I must conclude that "vicinity" means the vicinity of the wellhead where the gas is produced and not the vicinity or vicinities where it is delivered or sold by the lessee.

██ The burden of establishing the price rests on the plaintiff. The evidence offered by the plaintiff does not meet the requirement since it purports to show only the amount paid for gas after delivery to various customers for retail sale and consumption. The defendant offered a number of witnesses and established the fact that in the vicinity of the Checkerboard area no more than 12¢ per Mcf was paid until 1951; that after that time the rate was raised by some operators in excess of 12¢; and in 1953 another raise was made to 16¢ per Mcf.

I consider this evidence offered by the defendant as pertinent to the issue. It establishes the 12¢ rate which was paid until 1951 when it raised the rate to 15¢ per Mcf and in 1953 when the rate was again raised to 16¢ per Mcf.

I conclude that the defendant has met the terms of the lease with reference to the payment of royalties and that the plaintiff has no valid claim for damages from that source.

██ The contention of the plaintiff that the defendant did not adequately develop the property, which failure resulted in drainage of gas from beneath the premises by foreign gas wells on adjoining premises, cannot be sustained. It must be borne in mind that the plaintiff must bear the burden of proof on this issue and convince the court by a preponderance of evidence that there has been drainage. Mere surmise or conjecture is not sufficient to supply a premise upon which a judgment can be based. It is incumbent upon the lessor to prove that the lessee by negligence permitted the drainage. Central Kentucky Natural Gas Co. v. Williams, 249 Ky. 242, 60 S. W.2d 580.

██ The court cannot find for the plaintiff on this issue by placing an inference upon an inference. It cannot be inferred that there was a large deposit of valuable gas in the plaintiff's land and further inferred that it was not converted into profit for the plaintiff for the sole reason that the defendant, by negligent development, drained the gas from the plaintiff's holdings to its own or other leaseholds.

The burden is always on the lessor to show his damages by first establishing the fact that the gas which he claims to have lost was at one time on his property and, secondly, that it left his property by reason of the negligence of the defendant. Duff v. Bailey, 96 S.W. 577, 29 Ky. Law Rep. 919; Carroll Gas & Oil Co. v. Skaggs, supra. In the Carroll Gas & Oil Co. case, Judge Logan in the opinion well said that it is difficult to show with certainty how much a lessor has been damaged because of the nature of the subject matter. There is not so much difficulty about the measure of damages as there is in obtaining the proof to establish with sufficient certainty what the damages have been.

It is an accepted principle of the law of Kentucky that if damages of this nature can be shown with reasonable certainty, the lessor is entitled to recover. However, that places upon the lessor a serious and difficult responsibility. The plaintiff's first complaint on this phase of the case is that the lessee failed to comply with the terms of the lease as set out in Paragraph 17. It provides, among other things, that the lessee is to drill one well for each 1,000 acres of land, and thereafter drill such additional wells as will reasonably develop the demised

premises for both oil and gas, and that the wells drilled for each 1,000 acres of land shall be drilled on a separate block.

Paragraph 8 of the lease provides, among other things, that upon certain conditions the extraction of gas from the lessor's property "shall be prosecuted continuously with reasonable diligence so long as the capacity is such as to make such production profitable, so far as consistent with marketing conditions, and the Lessee shall not discriminate against the oil or gas wells on the demised premises in favor of any other oil or gas wells operated by the Lessee in marketing gas and oil, or either, from oil and gas wells operated by the Lessee in the vicinity or adjacent to said demised lease."

In considering the question of drainage, it is important to bear in mind the pattern of development followed in the Checkerboard. At the risk of possible repetition, certain facts in that connection should be here set out. Numerous exhibits portray the facts. Since Plaintiff's Exhibit C shows the production by the defendant in the Checkerboard for the period 1939 through 1952 and since it is stipulated that that exhibit correctly portrays the facts, I have selected it from among the other exhibits as the model on which to base my discussion.

This exhibit is a good picture of the Checkerboard. Of the 268 blocks or squares in the Checkerboard (it should be noted that blocks 24, 58 and 92 of the original 271 are missing), the even numbered ones are owned in fee by the Kentucky-West Virginia Gas Company and the royalty in the odd numbered blocks is owned by the plaintiff. The acreage is almost equally divided between the two owners, with the plaintiff owning 14,983 acres and the Kentucky-West Virginia Gas Company owning 14,611 acres. In addition to this the United Fuel Gas Company owns 5,240 acres, which was formerly the property of Elk Horn Coal Corporation, and the Kentucky-West Virginia Gas Company owns 4,721 acres, which was acquired from a source other than Elk Horn.

Exhibit C pictures these respective ownerships in colors as follows: The Lafitte Company acreage, green; Kentucky-West Virginia Gas Company acreage acquired from Elk Horn Coal Corporation, red; United Fuel Gas Company acreage, orange; other Kentucky-West Virginia Gas Company acreage, yellow; United Carbon Company acreage, blue; and acreage not in the above category, brown.

It must be conceded that the ultimate determination of the question of drainage must be based upon the testimony of experts; that is, engineers and men of practical experience in oil and gas development who have made a serious and comprehensive study of the Checkerboard area and of the particular locations of the plaintiff's acreage and areas adjacent thereto. The court can understand and sympathize with the statement made by the plaintiff that it was difficult to get an engineer or one versed in the matter of gas production to serve it for the purpose of making an examination and testifying. I accept the plaintiff's statement that most experts in the field are employed by utilities companies and public service corporations and will not accept employment from other sources. That difficulty, however, also accentuates the seriousness of the problem with which the court is confronted when being asked to render a judgment in behalf of the plaintiff for $292,848.

I cannot conclude from the evidence in this case that there was improper development or failure of development on the part of the defendant to the damage of the plaintiff.

Plaintiff's exhibit No. 106 is a good portrayal of the development on the various leaseholds from 1932 to 1953, inclusive. It would serve no purpose for the court to analyze and summarize this exhibit. It is true that in the years 1932 through 1940 the development in other leaseholds was more extensive than on the Lafitte property, but according to the testimony of the plaintiff's expert, Mr. Dufendach, there was only around a

billion cubic feet of gas which was drained between the years 1932 and 1939; consequently, the gas not produced was not lost but was later converted into income for the royalty owner.

In the year 1940 there was no increase in the development of the Lafitte property. In 1941 and 1942 there was a substantial increase in the development but much less development than on the Kentucky-West Virginia Gas Company property. In 1943 the development on Lafitte was second only to Kentucky-West Virginia Gas Company. This was the case in 1944, 1945 and 1946. From 1947 to 1953 the development was equal. The exhibit discloses that there were 88 wells on each of these two properties. The graph shows that on the 5,240 acres operated by the defendant, which was not owned by the plaintiff, there were 55 wells drilled, while on the much larger acreage of the Lafitte property only 88 wells were drilled.

The plaintiff complains that this apparent discrimination on the part of the defendant was not reasonable development and in violation of the terms of the lease. The plaintiff points out that the chart also shows that by the end of 1935, fifty producing wells had been drilled on 2,987 acres in the Checkerboard area, or an average of one well to 59 acres, while at the same time the Lafitte acreage had one well to 514 acres. The defendant on its other acreage had one well to 150 acres.

The plaintiff's expert witness in support of its claim of inadequate development and wrongful drainage was Mr. Paul E. Dufendach, a consulting civil and petroleum engineer with thirty years experience in all phases of the oil and gas business. Mr. Dufendach was not a geologist. He was intimately familiar with the Checkerboard area. His duties, as a former employee of the Kentucky-West Virginia Gas Company from 1929 to 1950, required him to approve well locations on the leased acreage operated by Kentucky-West Virginia Gas Company in the Checkerboard and on the

mineral properties which were owned in fee by that company.

This witness expressed the opinion that "the entire shale body, or the entire area, in this particular case is one reservoir. There may be places where relatively small wells are drilled, but that would happen to be at a location where very few fractures or joints had occurred, and, consequently, the shale was not able to give up gas in commercial quantities."

Mr. David M. Young, a witness for the plaintiff, stated his qualifications with reference to his experience and knowledge on the question of drainage. He expressed the opinion that "the shale constitutes essentially the same reservoir over a fairly large area." This, in a sense, may corroborate the one large "pool" theory of the witness, Dufendach, but the further testimony of Mr. Young somewhat weakens the inference. He stated he found that there was considerable movement of gas in the Devonian shale in the Checkerboard area; that while there had been drainage from the Lafitte area, according to his isobar map, he could not distinguish drainage from simple migration. The witness testified that his isobar map showed that there had been general drainage from the Devonian shale in all directions but not toward any particular well; that the gas moved in the Devonian shale over several square miles or several thousand acres. Mr. Young declined to give an estimate of the volume of drainage from the Lafitte property.

In opposition to the "one pool" theory of the witnesses for the plaintiff, the defendant offered Mr. W. B. Maxwell, its assistant superintendent of production. Mr. Maxwell served as chief geologist for the Warfield Natural Gas Company from 1944 to 1946 and prior thereto as assistant chief geologist. He is a member of the Kentucky Geological Society, Appalachian Geological Society, and the American Association of Petroleum Geologists. This witness expressed the opinion that the Checkerboard area pay

zones in the Devonian shale were in some instances connected but for the most part were not connected.

In criticizing the one pool theory, the comments of this witness are impressive. I quote from his testimony as follows:

"A. Well, first, I think that the whole basic approach to the thing was based on assumptions only and to actually know whether gas has been moved from one lease to another, you would would have to have an inventory of each acre, you would have to have an inventory of the even blocks, the odd blocks, all the other leases, before any drilling was done, you would have to know what you had down there. In other words, you have to know that you have something before you can determine you have lost it. Now, he has assumed that this acreage is one reservoir. Well, we know in the drilling of dry holes and small wells, that the thing is very erratic, we know there are no two wells alike that have been drilled in the whole area, out of the 333 wells. They don't have the same permeability, porosity, even pressures vary throughout the field. The volumes and the production vary considerably from well to well. In many cases wells with much lower rock pressure have produced far greater gas than wells with high rock pressure, which indicates that it is producing from a separate reservoir. So, his whole basic assumption I just cannot agree with.

"Q. Have you made any examination of the devices that he uses to establish what he refers to as drainage? A. Well, of course, he has assumed that each and every acre under the checkerboard area had started out with the same amount of gas and, of course, he has added production and he has added acreage and he has divided one by the other and, of course, you will come up with a figure, but from an engineering standpoint you might come up with

some kind of a figure that you could sit down and check, but he starts with an assumption, from a geological standpoint; that is not the approach, you couldn't approach it from that manner because you don't know—you don't know the permeability or the porosity or the pay thickness or the exact rock pressure of each zone, you don't know the—even the thickness varies within the shale itself. You don't know the extent of these reservoirs, so in my opinion I just can't agree with it."

Another witness for the defendant on this point was Mr. Charles Gregory Krebs, a graduate geologist and mining and petroleum engineer. Mr. Krebs testified that the Checkerboard property had been adequately and reasonably developed; that there were numerous reservoirs but that it was impossible to tell with any degree of accuracy the exact horizon, individual reservoir or multiple reservoirs from which any well or wells might be producing. He said that there was not a continuous reservoir. The witness expressed the opinion that there had been no drainage of the Lafitte acreage between 1932 and 1952 and that there was no evidence on which such an assumption could be based.

The witness, E. E. Roth, testified that he was a graduate of the University of Pittsburg with a Master of Science degree in petroleum geology and that he had been making geological and allied studies of gas production and gas reserves for thirty-six years. He was at the time he testified vice-president of the Columbian Gas System Service Corporation in charge of geology and production. Mr. Roth testified that in his opinion there is not one reservoir, but that the area contains innumerable reservoirs.

The Devonian shale or black shale from which this gas is produced lies 3,000 feet below the earth's surface in this locality. We are therefore dealing with a situation which presents an almost insurmountable obstacle to a true understanding or real knowledge of what actually trans-

pires in the movement of gas. As one of the engineers who testified said, it presents a question which no engineer can possibly answer with assurance.

The rule which permits a lessor to recover damages for a lessee's breach of covenant to develop gas wells on the leasehold rests on the assumption that it can be shown with reasonable certainty that the lessor has been deprived of his part or at least a certain quantity of gas which the lessee would have produced had he exercised proper diligence. 60 A.L.R. 957. The plaintiff must necessarily pull a heavy laboring oar.

Since the plaintiff's case on this point rests on its theory that the gas in the Checkerboard was contained in one pool, I must conclude that the evidence is not sufficient to sustain the plaintiff's position. On the contrary, the evidence is overwhelmingly opposed to the "one pool" theory.

So far as the express terms of the lease are concerned, the lessee developed the leasehold by drilling the original fifteen wells. There was an implied covenant to develop with care and dispatch the remainder of the property in the same way. Following the plaintiff's theory of drainage to its logical conclusion it must be determined that the plaintiff has suffered no damage by reason of failure of development. If there is not a single pool of gas there could be no drainage and where there is no drainage there is no damage. The lessor has not asked for a cancellation of the lease for nondevelopment. The wells are on the leasehold and since the gas can yet be produced, the plaintiff has sustained no loss. 24 Am.Jur. Sec. 159, p. 642; Sec. 178, p. 657.

The witness, Krebs, gave in his evidence (Vol. XI, pp. 1561–1563, Transcript) a comprehensive discussion of the plan of development and the reasons which prompted the method of development of the Checkerboard area.

In determining the rights of individual contracting parties, the law is concerned with the rights of all lessors or property owners within a gas field and their rights must be considered as affecting the lessor's right to drilling of additional gas wells, and a fair degree of equality between them should be had in the drilling operations. The plaintiff was entitled to have its properties reasonably developed and in determining whether its property has been so developed, it is necessary to consider whether it has been fairly treated when its particular development is considered in relation to other development in the territory, taking into account the cost of development, the economic condition of the times over a period of years, the return on the money expended by the operator, and the need for development in the industry. Union Gas & Oil Company v. Fyffe, 219 Ky. 640, 294 S.W. 176; Midland Gas Coporation v. Reffitt, 286 Ky. 11, 149 S.W.2d 537.

In 1941 and 1942 fifteen wells were drilled on the leased premises. In 1943 ten wells were drilled. No demand for further development was made until June 15, 1943. Before a recovery for damages can be had, the lessor must make a demand for further development. Central Kentucky Natural Gas Co. v. Williams, supra, states the rule to be that to entitle the lessor to further development he is required to give notice, plain and unequivocal in its meaning, to go forward and develop after reasonable notice. See B. & B. Oil Co. v. Lane, Ky., 249 S.W.2d 705; Rowe v. Ashland Oil & Refining Co., Ky., 240 S.W.2d 61.

All of the eighty-eight wells now on the premises had been drilled by the end of 1947.

I am of the opinion that there was proper development of the leasehold by the defendant and that no drainage resulted through the negligence of the lessee.

The plaintiff also claims that it is entitled to one-eighth gross income received from the lease from the sale of gasoline, propane, butane and other hydro-carbons reduced or manufactured from the gas

taken from its premises since January 1, 1950.

The only manufacturing of hydro-carbons from gas was done at Leach, Kentucky, at a plant purchased by the defendant from the Virginia Gasoline & Oil Company as of January 1, 1950. This plant was not on the leased premises but was a distance of 65 or 70 miles from the area. There were no by-products produced on the premises. The title to the gas had passed when any of the by-products were produced and the gas from the Lafitte premises had become commingled with gas from other sources.

The claim of $4,548 under this item is arrived at by taking the quantity of gas treated at the Leach plant, the natural gasoline produced in thousands of gallons per million cubic feet, the total production of gasoline in the thousands of gallons for the amount of gas treated and from those figures striking an average amount of the natural gasoline. According to the computation of the witness, Dufendach, there had been 27,015,000,000 cubic feet of Lafitte gas processed at the Leach plant.

The defendant shows that the Lafitte gas is commingled with gas purchased from other sources before it goes into the by-products plant at Leach and that there are no records and no method can be found whereby it can be determined what portion of the gas purchased from Lafitte is used for by-products. On this point the following questions and answers from the transcript of the record are pertinent (Vol. VIII, p. 1164):

"The Court: Now, let me give you a hypothetical question. Let us assume that you were going to enter into a contract to purchase gas from John Doe at his well—he just had one well—and it produced we will say a million cubic feet of gas a day and he had an agreement with you that he was to have an eighth of the gross sale price of that gas, both consumed as gas and as by-products. How could you keep that separate?

"The Witness: You can't.

"The Court: How would you do it?

"The Witness: It cannot be done and it is not done in the industry.

"The Court: Do you know of any instance in the industry where that is done?

"The Witness: No, sir, I do not. The gas is purchased, where you are talking about an arm's length contract, the gas is purchased at a fixed price at the point of delivery."

And on p. 1166:

"The Court: Do you know of, at any time in your experience, any contract or arrangement or understanding whereby a purchaser of gas separates the gas into by-product gas and consumption gas and accounts to the producer on two separate items?

"The Witness: Not to my knowledge, sir.

"The Court: Is it possible to do that?

"The Witness: It would be possible to this extent and you would have to have some very special circumstances."

It is further shown that where the gas is stripped and there is realized from it a by-product, the sale of that by-product by the commissions is credited back to the cost of service to the customer. In other words, if the defendant were to realize any profit from the stripping of gas and the taking out of natural gasoline from it or propane or butane, whatever was realized from the sale of the product is credited back to the cost of service, thereby in effect reducing the price of gas to the ultimate consumer, either wholesale or domestic.

■ Paragraph 2 of the lease contains the language on which the plaintiff bases its claim for additional royalties by reason of the sale of by-products. It is my conclusion that it was in the contemplation of the parties to the lease originally that there might possibly be set up on the leased premises a plant for the manufacture of by-products. The lan-

guage of the lease to the effect that "it is expressly understood that the Lessee shall have the right to erect and operate on the demised premises a plant or plants for the manufacture of gasoline and by-products * * * " can lead to no other conclusion. Had the parties been considering any other place for the manufacture of by-products on which an additional royalty was to be paid, they could very easily have said so, but where their language is as quoted no fair inference can be had that it was intended to cover a plant off the leasehold and in this particular instance 65 to 70 miles away. It should also be noted that the lease uses the term "erect". As has been stated, the plant at Leach was purchased and so far as the record goes *no* plant has been *erected* by the defendant.

It should be borne in mind that the lease permits the lessee to sell by-products to its subsidiaries and to itself. In the opinion of the court royalties on by-products should be paid only if an extraction plant should be located on the leased premises.

Recovery for by-products is denied.

Notwithstanding the fact that I am of the opinion that the plaintiff has failed to sustain the allegations of its complaint and complaint as amended, I will consider the separate defenses.

The defenses of payment and accord and satisfaction are closely related and will be treated together. They are not sustained by the record as to the whole claim. In order for these defenses to be applicable it must be shown that there was a dispute between the parties at the time of the acceptance of the payments. Accord and satisfaction is dependent on contract and requires a meeting of the minds of the parties who offer and accept payment with full knowledge of the material facts. Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27.

The first notice to the defendant that the amount the plaintiff was receiving was being questioned was in the letter of February 14, 1951, from Mr. Brown.

This cannot be considered a dispute but merely an inquiry and a suggestion that an investigation might be desirable. No dispute within the contemplation of the law can be considered to have arisen until the letter from Mr. Brown, as president and general counsel for The Lafitte Company, to Mr. B. J. Pettigrew, general counsel of the United Fuel Gas Company, of February 25, 1952, in which Mr. Brown stated that the lessor was contending that sufficient royalty had not been paid.

The rule in Kentucky is that where there is a genuine dispute as to the amount due and a sum is tendered in satisfaction of the claim, its acceptance is a complete accord and satisfaction. Cunningham v. Standard Construction Co., 134 Ky. 198, 119 S.W. 765; Commonwealth v. Breslin Const. Co., 291 Ky. 772, 165 S.W.2d 809; Product Advancement Corp. v. Paducah Box & Basket Co., D.C., 114 F.Supp. 25.

A stipulation was signed by the litigants on November 1, 1954, agreeing that from and after September 1954, Lafitte accepted all royalty checks without prejudice to the claim for additional royalties if otherwise due and payable.

I conclude that the payments of royalties accepted by the plaintiff from February 25, 1952, to September 1954 were made and received when a bona fide dispute existed between the parties and that the defense of payment and accord and satisfaction as to these payments is valid.

In some respects there is between the defenses I have just discussed and the defenses of laches and estoppel a very fine and at times almost indiscernible distinction. An authority which may apply to payment and accord and satisfaction is also an authority to be considered when determining the defenses of laches and estoppel. The distinction I shall make in considering these defenses on the record before me is based primarily upon the time when the dispute arose and by giving to the plaintiff the benefit of its theory that it accepted payments without knowledge. The refinement may not be

justified and is confused in many instances, but I am of the opinion that payment and accord and satisfaction can only apply where there is full knowledge of the facts and a dispute, while the defenses of equitable estoppel and laches can be sustained where the parties had knowledge of the facts or where there was opportunity to know the facts.

The lessor was not only given the right to learn and know all the facts with reference to the production, wholesale price in the vicinity, and the basis on which the payments were made, but had its auditors and accountants visit the home office of the defendant where they were shown all of the books and records they requested as being of any pertinence or importance to the lessor. The lease provided that each party should have "constant access to the meters".

By retention of the royalty checks and accounting statements by the plaintiff and its predecessors, without any objection whatever, for the long period of years (1924 to 1952), and all of the accompanying circumstances discussed by the court, the defenses of equitable estoppel and laches are sustained. Where the lessee renders to the lessor monthly accounts and makes payments based thereon which the lessor receives and keeps without objection, such accounts are conclusive on the lessor, in the absence of full and satisfactory evidence of fraud or mistake. Thornton, Law of Oil and Gas, Vol. 2, Sec. 397.

Laches involves more than a failure to assert a claim. The equity in the defense is that there has been an unreasonable delay under all the circumstances over a period of time during which material changes in conditions have resulted, and where it would be unjust to disturb the status quo thus created. Walter Bledsoe & Company v. Elkhorn Land Company, 6 Cir., 219 F.2d 556; Barrowman Coal Corporation v. Kentland Coal & Coke Co., 302 Ky. 803, 196 S.W.2d 428.

By the unreasonable delay of the plaintiff in asserting its claim for additional royalties, the status of the parties over the years has materially changed. To realize the full impact of the change we have but to consider the almost insurmountable difficulty which would arise if the prayer of the complaint should be sustained. The defendant is a utility company and public service corporation. Its rates, intra and interstate communications, and delivery of gas are subject to the legislative authority of the State of Kentucky and the congressional authority of the Congress of the United States. Rates have been fixed on the basis of the price paid for gas and the arrangement for the delivery of the gas, which involved commingling it with gas from other lessors, under circumstances and conditions known and accepted over a period of more than a quarter of a century by both parties to the lease and their predecessors in title.

This is a clear case for the equitable defenses of estoppel and laches.

The five-year statute of limitations, KRS 413.120, is not applicable. The action is based on the construction of a written contract and there is no allegation of fraud or mistake. Southeastern Gas Co. v. Estepp, 269 Ky. 147, 106 S.W.2d 142.

The plea of the fifteen-year statute of limitations, KRS 413.090, is sustained as an absolute defense to all of the claims against the defendant prior to May 19, 1939, which was fifteen years before the commencement of this action. Southeastern Gas Co. v. Estepp, supra. The contention of the plaintiff that this fifteen-year statute is not a bar, due to the fact that the defendant over a period of a great number of years misled the plaintiff by false statements and vouchers, is not sustained by the evidence. Nothing is disclosed which would justify the court in finding as a fact that the plaintiff was misled in any way. Such a finding would, of course, be clearly inconsistent with the court's ruling that the defense of equitable estoppel is good. Further discussion of the statutes of limitations would serve no purpose.

I am of the opinion that the plaintiff's complaint should be dismissed and that the defendant should have judgment for its costs herein expended.

Findings of fact, conclusions of law and judgment in conformity with this opinion are this day entered.